OPINION
{¶ 1} After trial by jury, appellant, Irving R. Russ, was convicted of "hit and skip," tampering with evidence, and complicity to tampering with evidence. He now appeals from the judgment of conviction entered by the Trumbull County Court of Common on the jury's verdict. For the reasons discussed below, we affirm.
 {¶ 2} At approximately 9:40 p.m., on August 16, 2004, appellant was traveling west on Route 422 in Niles, Ohio. Appellant was driving a Mazda Navajo SUV which *Page 2 
belonged to his girlfriend, Raheema Wright. He was talking on his cell phone as was his passenger, Jarrell Reed. As the vehicle approached the intersection of North Road, Lai Ying was attempting to cross the intersection accompanied by her two grandchildren, 10 year old Annie Lee and her younger brother, Andrew. The trio began to cross the busy street with Annie leading the others. When they reached the middle of the road, Lai Ying noticed an oncoming vehicle moving at a high rate of speed. As the vehicle sped past, it hit Lai Ying's hand, causing her to tumble back and Andrew to fall. Unfortunately, the vehicle struck Annie squarely with such force she bounced onto the hood cracking its windshield. Appellant continued through the intersection, briefly stopping in an Arby's parking lot wondering what to do. At Reed's urging, the two men fled the accident scene.
 {¶ 3} As the men retreated, appellant called Wright and explained he "might have hit a deer or some people or something." He subsequently advised Wright to report the SUV stolen. Following appellant's orders, Wright went to the Warren Police Department and filed a false police report stating the SUV was taken from her driveway after she left it unattended with the engine running.
 {¶ 4} While Wright was filing the spurious report, appellant abandoned the SUV on the southeast side of Warren. At approximately 10:00 p.m. that night, William Miller, a Warren resident who owns rental property at 2759 Wick Street in Warren, was checking on his property. When he arrived at the address, he noticed an SUV parked partially in the roadway, and partially in the ditch. Concerned about possible vandals, Miller contacted the Warren Police Department and waited for officers to arrive. While *Page 3 
waiting, Miller suddenly noticed a black male entering the SUV; Miller ordered the man to stop, however, the SUV drove away. Miller followed the SUV to a vacant lot where the driver jumped from the vehicle and ran into the woods.
 {¶ 5} Warren Traffic Patrolman Ed Hetmanski responded to Miller's call around 11:00 p.m. When he arrived, Hetmanski checked the license plate number on the abandoned SUV and discovered it was reported stolen. Hetmanski determined the vehicle was registered to Raheema Wright, who, coincidentally, was still at Warren Police Department completing her fabricated police report. Patrolman Mark Klahoz drove Wright to Wick Street to reclaim the abandoned vehicle around midnight. Once they arrived, both Wright and the officer noticed damage to the vehicle; to wit, the driver's side headlight was broken out, the hood was dented, and the windshield was cracked. Wright drove the vehicle away but, rather than take it to her residence, she parked it in her cousin's garage on Laird Avenue in Warren. The evidence revealed that, from the time immediately following the accident and the time Wright recovered her vehicle, appellant and Wright exchanged some 13 cell phone calls.
 {¶ 6} At or around the time Wright was being transported to her vehicle, Ray Cambridge, appellant's father was working in his garage on his motorcycle at 2734 Brier Street, in Warren. Brier Street is approximately one block from Wick Street. After stealing into the wooded area, appellant, with Reed, visited Mr. Cambridge. Appellant attempted to explain his situation to his father. Appellant told Cambridge he thought he hit somebody somewhere on 422. However, Cambridge, who was disgruntled with *Page 4 
appellant, told his son to leave because he did not want to get involved. Appellant and Reed left.
 {¶ 7} Shortly after the accident, Niles Patrolman John Marhulik, while investigating the scene, recovered a Mazda headlight from the intersection. He subsequently contacted two area Mazda dealerships to determine whether anyone had recently brought a Mazda to either garage for repairs. The dealers indicated that while no such repair work had been done, the head lamp likely came from a Mazda Tribute or a Ford Escape. Marhulik consulted the Law Enforcement Automated Data System (LEADS) for a print out of all individuals who own a Mazda Tribute or Ford Escape. After discussing the evidence with Warren police officer Ben Harrell, however, the investigators determined the vehicle was neither a Tribute nor an Escape, but rather a Mazda Navajo. Another LEADS search led investigators to Raheema Wright.
 {¶ 8} On September 13, 2004, investigators contacted Wright at her home. Eventually, Wright took Harrell and Marhulik to the garage on Laird where she had parked the Navajo. Niles police towed the vehicle for processing by the Bureau of Criminal Identification and Investigation (BCI). BCI Forensic Scientist Donna L. Rose testified that the pieces of automotive debris recovered from the scene matched the grill removed from Wright's Navajo. Although she originally denied appellant had her vehicle on the night in question, she eventually told police appellant had called her on August 16, 2004 and explained he had struck "a deer or people" with the vehicle. She also stated appellant advised her to file a false police report stating the Mazda had been stolen. Wright was later charged with falsification and obstructing official business. *Page 5 
Because of her connection to and knowledge of the details of the crime, the state offered Wright a plea deal which she accepted. Pursuant to the terms of the plea agreement, Wright would plead guilty to the falsification charge and the state would dismiss the obstruction charge in exchange for Wright's cooperation in the investigation.[1]
 {¶ 9} On February 2, 2006, appellant was indicted on one count of "hit and skip," a felony of the fifth degree, in violation of R.C. 4549.02(A) and (B); one count of tampering with evidence, a felony of the third degree, in violation of R.C. 2923.03(A)(1) and (B); and one count of complicity to tampering with evidence, a felony of the third degree, in violation of R.C. 2923.03(A)(1)and (F) and R.C. 2921.12(A)(2) and (B). Appellant entered a plea of not guilty to all charges.
 {¶ 10} On October 20, 2006, the matter proceeded to jury trial and, on November 8, 2006, appellant was found guilty of all charges. On March 6, 2007, appellant was sentenced to a prison term of 12 months on the "hit and skip" charge; 5 years on the tampering with evidence charge; and, 5 years on the complicity to tampering with evidence charge. The two 5 year sentences were ordered to run consecutively with one another while the 12 month sentence on the "hit and skip" was ordered to run concurrently with the tampering with evidence charge. In all, appellant was sentenced to an aggregate term of 10 years imprisonment.
 {¶ 11} Appellant now appeals and asserts four assignments of error. His first assignment of error alleges: *Page 6 
 {¶ 12} "The trial court erred to the prejudice of appellant by denying appellant's motion to dismiss the charges against him."
 {¶ 13} Under his first assignment of error, appellant claims the trial court erred when it denied his motion to dismiss his indictment when the audio statement of his co-defendant was lost by the City of Niles Police Department.[2]
 {¶ 14} A trial court's determination relating to a motion to dismiss is reviewed de novo. State v. Palivoda, 11th Dist. No. 2006-A-0019,2006-Ohio-6494, at ¶ 4. When a motion to dismiss is premised upon the state's failure to preserve evidence, the trial court must first determine whether the evidence was "materially exculpatory" or "potentially useful." See Arizona v. Youngblood (1988), 488 U.S. 51,57-58. The failure to preserve materially exculpatory evidence violates a defendant's due process rights irrespective of whether the state acted in good or bad faith. State v. Geeslin, 116 Ohio St.3d 252,2007-Ohio-5239, at ¶ 7, citing State v. Johnston (1988),39 Ohio St.3d 48, 60; see, also, Brady v. Maryland (1963), 373 U.S. 83. Evidence is materially exculpatory only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Johnston at paragraph five of the syllabus. "A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id. *Page 7 
 {¶ 15} Alternatively, evidence is not materially exculpatory if it is considered only potentially useful. State v. Lothes, 11th Dist. No. 2006-P-0086, 2007-Ohio-4226, at ¶ 18. The failure to preserve potentially useful evidence violates a defendant's due process rights only upon a showing that the state acted in bad faith. State v.Lewis (1990), 70 Ohio App.3d 624, 634. The "term `bad faith' generally implies something more than bad judgment or negligence. `It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud.'". State v. Wolf, 154 Ohio App.3d 293, 2003-Ohio-4885, at ¶ 14, quoting Hoskins v. Aetna Life Ins. Co. (1983),6 Ohio St.3d 272, 276. (Internal quotation marks and citation omitted.)
 {¶ 16} Here, the tape in question was a mini-cassette used by the City of Warren Police Department to record a statement given by Raheema Wright, a witness for the state and appellant's co-defendant. The record reveals that the Warren Police contacted Wright on November 25, 2004; after speaking with her at her home address on Summit Street in Warren, the police requested that Wright come to the Warren Police Department for an interview relating to a stolen vehicle report she filed on the night of the accident. The interview was recorded using a mini-cassette tape recorder while the highlights of the interview were contemporaneously transcribed by Detective Michael Stabile.
 {¶ 17} Detective Stabile's interview notes, which totaled four pages, revealed appellant drove a Cadillac but had occasion to drive Wright's Mazda Navajo SUV. Further, according to his notes, when Stabile asked Wright whether appellant could *Page 8 
have taken the SUV, Wright replied: "I'll be honest, I don't think so. I would hope not, because if he did, he left me carrying a great weight."
 {¶ 18} After the interview, Detective Stabile gave the cassette tape to Niles City Police. Although no copy of the audio tape was made, Captain Chuck Wilson and Detective James Robbins of the Niles Police Department testified Niles Police followed the proper procedure for tagging and logging evidence. However, because their audio equipment could not play the mini-cassette, the Niles Police were unable to listen to the interview. Ultimately, Niles officers returned the tape to the Trumbull County Prosecutor's Office in Warren with the expectation Investigator Gary Hetzel could make a workable copy of the interview. Hetzel was unable to do so and returned the tape to Captain Wilson. Eventually, Niles Police contacted the Warren Police Department to assist in copying the tape; when Detective Stabile arrived at the Niles Police Department, however, the tape could not be found. Detective Robbins testified he looked "over and over" for the tape but could not locate it. As a result of the misplaced tape, appellant moved the trial court to dismiss the indictment.
 {¶ 19} Appellant contends the notes and summary of the interview written by Detective Stabile "did not contain detailed information of the interview" and therefore the original tape was materially exculpatory. First, appellant fails to elucidate what, in his estimation, was or may have been omitted from the transcription that would have been materially exculpatory. Simply because the detective's notes did not provide a verbatim recitation of the entire interview does not imply he omitted salient details favorable to appellant's defense. *Page 9 
 {¶ 20} With that in mind, however, appellant points out that, according to Stabile's notes, Wright gave statements on tape indicating appellant was innocent. However, after being charged with crimes resulting from her filing of the false police report and being offered a favorable plea by the state, she changed her story.
 {¶ 21} Although the taped interview was not available at the time of trial, Detective Stabile's notes do indicate Wright originally denied appellant had any involvement in the filing of the false police report. In particular, when asked whether appellant could have been driving her Mazda SUV on the night in question, Stabile's notes reflect Wright responded: "I'll be honest, I don't think so. I would hope not, because if he did, he left me carrying a great weight." Defense counsel had a copy of Stabile's notes which underscored their position that Wright had previously provided a competing version of the facts which were inconsistent with her trial testimony. The notes, therefore, accomplished the same objective and arguably possessed the same probative value as the interview.
 {¶ 22} Moreover, evidence that Wright changed her original version of events was also put forth at trial during both her direct and cross-examination. Wright testified that the police report she filed indicating the Mazda SUV was stolen from her driveway was false and she lied simply because she "didn't want [appellant] to get in any trouble." She further testified she was originally charged with falsification and obstruction of official business. The obstruction charge was dropped and she pleaded guilty to the falsification in exchange for her assistance in the case and testimony at trial. Even without the audio tape, defense counsel was able to underscore that Wright received *Page 10 
benefits after implicating appellant. As a result, defense counsel was able to draw suspicion to her credibility as a witness without the evidence he asserts was necessary for this purpose.
 {¶ 23} Notwithstanding this conclusion, appellant relies upon the Sixth Appellate District's decision in State v. Durnwald,163 Ohio App.3d 361, 2005-Ohio-4867 for the proposition that the state had an unqualified duty to safeguard the tape and its failure to do so was a violation of his due process rights. We believe Durnwald is fundamentally distinguishable from the instant matter. InDurnwald, the appellate court held that a police officer's accidental erasure of a video tape of a DUI arrest violated the appellant's right to due process. In so holding, the court drew a distinction between uniquely non-reproducible evidence and evidence available via recourse to other means. The court observed:
 {¶ 24} "The videotape was the only direct evidence available to appellant to show appellant's condition at the time of arrest and is, therefore, unique and unattainable by other means. Therefore, since the videotape was not preserved, any testimony by the trooper regarding evidence that may have been recorded by the videotape, including field sobriety tests or statements made by appellant, should have been suppressed." Id. at ¶ 36.
 {¶ 25} Here, the original audio tape would have, at best, been used to challenge Wright's credibility. However, Wright's credibility was effectively called into question without the tape. The jury was aware that Wright's story had changed since the original interview. The jury was further aware that Wright had previously lied to authorities in *Page 11 
filing a false police report. Finally, the jury heard evidence that Wright received the benefit of the state dismissing the obstruction charge as well as a relatively lenient sentence after she pleaded to the falsification charge in exchange for assisting authorities in the instant matter and testifying for the state. In short, the content and overall impact of the taped interview was not "unique and unattainable by other means."
 {¶ 26} This issue was recently revisited by the Supreme Court of Ohio in Geeslin, supra. There, the Court reaffirmed the Youngblood test and, in so doing, declined to hold that the state has an unqualified duty to safeguard all evidence relating to an arrest and/or investigation. Specifically, in Geeslin, the defendant was stopped by a state trooper after repeatedly crossing the white edge line of the roadway. The trooper smelled alcohol on the defendant and asked him to perform field sobriety tests. The defendant performed poorly on the tests and was arrested for operating a vehicle while intoxicated. The entire episode, beginning with the erratic driving and concluding with the defendant's arrest, was recorded on videotape. However, at some later point, the trooper accidentally erased the portion of the tape which recorded the erratic driving. After being indicted on two felony counts of OVI, he moved to dismiss the charges. The defendant argued that the portion of the videotape that was lost contained possible exculpatory evidence which was destroyed by the state in violation of his right to due process. The trial court granted the motion and the Third District Court of Appeals reversed. *Page 12 
 {¶ 27} After accepting discretionary review, the Supreme Court affirmed the decision of the Third Appellate District. In doing so, it distinguished the matter before it from Dumwald, supra, stating:
 {¶ 28} "Here, the missing evidence would not have been used to acquit appellant of the impaired-driving charge itself. Rather, it would have been used only with regard to the validity of the stop that led to appellant's arrest. We conclude, therefore, that the missing evidence in this case could not have been materially exculpatory evidence within the meaning of Brady [supra] * * *; but was instead potentially useful evidence." Geeslin, supra, at ¶ 13.
 {¶ 29} We recognize that the nature of the evidence in this case differs from that in Geeslin. In Geeslin, the lost footage related to an issue not specifically pertinent to the conviction under review, viz., the issue of whether the trooper properly stopped the defendant. Alternatively, in this case, the lost evidence clearly related to important issues at trial, viz., proof of the charges of tampering with evidence and complicity to tampering with evidence. However, due to Wright's testimony at trial, we believe the evidence would have been cumulative and therefore, similar to the evidence in Geeslin, not materially exculpatory within the meaning of Brady.
 {¶ 30} At trial, Wright testified (1) she originally gave a statement inconsistent with her testimony, (2) the statement was false, (3) she lied to police to protect appellant, and (4) she received a favorable plea in exchange for her testimony against appellant. Moreover, defense counsel aggressively cross-examined Wright on these matters. As far as we can discern, the original tape, if available at the time of trial, *Page 13 
would have been used to impeach Wright's credibility. In this respect, any probative evidence that could have been gleaned from the tape was heard by the jury and therefore the absence of the taped interview did not "undermine confidence in the outcome" of the trial. We therefore hold the evidence was not materially exculpatory but merely potentially useful. We must therefore analyze whether the investigating officer's failure to preserve the evidence was a result of bad faith. We hold it was not.
 {¶ 31} The record reflects the investigating officers within the Niles Police Department fully intended to preserve the audio tape of the interview. They followed their standard procedure for evidence intake by tagging and recording it in their log. However, when they attempted to listen to its content, the department's audio equipment was unable to play the interview. They accordingly sought the assistance of the Trumbull County Prosecutor's Office to make a back-up copy for use on their equipment but were unsuccessful. Finally, they contacted Detective Stabile to assist. However, when the investigators went to retrieve the tape, it was missing. Nothing in the record indicates the Niles Police Department intentionally lost the tape. There is no evidence of fraud, dishonesty, or any iniquitous design on their behalf. To the contrary, the record indicates the officers had a strong interest in making sure the tape was preserved, at the very least, for their own investigative purposes. Although the tape was potentially useful to appellant and it was misplaced by agents of the state, the misplacement was an accident untainted by bad faith.
 {¶ 32} Appellant's first assignment of error is overruled.
 {¶ 33} Appellant's second assignment of error provides: *Page 14 
 {¶ 34} "The trial court erred in allowing hearsay evidence that did not qualify as a hearsay exception."
 {¶ 35} Under his second assignment of error, appellant contends the trial court erred when it allowed the state to introduce the police report filed by Raheema Wright which falsely stated her Mazda SUV had been stolen.
 {¶ 36} Generally, a reviewing court will not disturb a trial court's evidentiary rulings absent an abuse of discretion. State v.Williams, 11th Dist. No. 2005-T-0123, 2006-Ohio-6689, at ¶ 22. Thus, to the extent the trial court's ruling is neither arbitrary nor unreasonable, it shall withstand the scrutiny of appellate review. Id.
 {¶ 37} Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). "Hearsay is not admissible except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute * * * not in conflict with a rule of the Supreme Court of Ohio, by [the rules of evidence], or by other rules prescribed by the Supreme Court of Ohio." Evid.R. 802. Evid.R. 803(8) creates an exception to the hearsay rule pertaining "public records and reports." However, "[i]n criminal cases, Evid.R. 803(8)(b) excludes from the public-records-and-reports exception to hearsay police reports that `recite an officer's observations of criminal activities or observations made as part of an investigation of criminal activities.'" State v. Leonard104 Ohio St.3d 54, 75, 2004-Ohio-6235, quoting, State v. Ward (1984),15 Ohio St.3d 355, 358. *Page 15 
 {¶ 38} Pursuant to the foregoing authority, appellant argues that the report in question should have been excluded because it merely contained an officer's statement about what Wright said, not Wright's personal statement. We disagree.
 {¶ 39} Appellant was charged with complicity to tampering with evidence as defined by R.C. 2923.03(A)(1) and (F) and R.C. 2921.12(A)(2) and (B). Pursuant to these code sections, the state was required to prove, beyond a reasonable doubt, appellant purposely solicited or procured another to commit the offense of tampering with evidence, i.e., make a record or document knowing it to be false with the purpose to mislead a public official who is or may be engaged in an investigation while knowing that an official investigation is about to be or likely to be instituted. The false police report filed by Wright is "record or document" at the base of the charge.
 {¶ 40} At trial, Wright testified the information in the report was false. She asserted she filed the report after appellant had contacted her on the night of the accident. According to Wright, appellant stated he had "hit a deer or some people or something." Appellant then advised Wright to report the Mazda SUV stolen. The state used the report at trial to prove appellant purposely solicited or procured Wright to make the record or document knowing it to be false with the purpose to mislead the police who would be investigating the accident. Accordingly, the purpose of offering the report at trial was to prove a substantive element of the crime of complicity to tampering with evidence, not to prove truth of the matters asserted in the report, i.e., that on August 16, 2004, Wright's Mazda SUV was stolen from her driveway. The content of the report *Page 16 
falls outside the definition of hearsay and was therefore competent and admissible evidence. The trial court did not abuse its discretion in admitting the report.
 {¶ 41} Appellant's second assignment of error is overruled.
 {¶ 42} Appellant's third assignment of error contends:
 {¶ 43} "The trial court erred and abused its discretion in sentencing appellant to an aggregate term of ten years where the record reveals that the only reason for doing so was personal bias on behalf of the trial court."
 {¶ 44} Under this assigned error, appellant claims the trial court's ten year sentence was improperly motivated by personal prejudices it harbored against appellant as well as public pressure to impose a harsh sentence due to the circumstances surrounding the crimes of which appellant was convicted. We disagree.
 {¶ 45} Before formal sentencing occurred, the parties met in chambers to discuss certain issues surrounding sentencing. During the discussion, defense counsel expressed his concerns about the court sentencing appellant without first consulting a pre-sentence investigation report (PSI). The prosecution properly pointed out that a court need not order a PSI where its plan is to sentence a convicted felon to prison. See Crim.R. 32.2. The court then added:
 {¶ 46} "* * * my understanding, is that [a court] is not allowed [to put] a person on any type of community [control] sanctions without [a] PSI being done. We sentence quite often without any type of a report back from the Probation Department. I think the reasoning is if a Court is going to allow a person on a community control sanction, the Judge should have some idea of what the background is. The background is really *Page 17 
irrelevant as far as a prison term is concerned. I asked for — there's a misunderstanding here on Defense counsel's part, but I think you check back through the record, and I had wanted to have some ideas about what his past criminal experiences have been before I sentenced, and thiswhole community has just been outraged about this thing, and I want to know what I'm going to do based on the facts, and what his record was. The only part of anything that made any sense to me that I had to know in addition to what the facts of this particular case are, and I have been provided that by the Probation Department." (Emphasis added).
 {¶ 47} Defense counsel promptly replied that he understood the court's desire to review appellant's past record for purposes of rendering a sentence; however, defense counsel pointed out that the court's sentence must be based upon the charges of which appellant was convicted, not upon the community's outrage. The court clarified that it would not be issuing its sentence based upon public pressures but was merely pointing out that the case had received a great degree of media attention. The court then explained:
 {¶ 48} "If it were up to — you can see from the amount of people here today, the interest. If this had been an old rum dum derelict who had been run over, I doubt if this thing would have caught much publicity at all. I doubt, if it had be, if I can be so crass, some other black person that had been run over[,] [t]his thing would never have gotten the notoriety.
 {¶ 49} "We had a situation here of a little girl, a sweet little girl by all estimates, who was struck, killed by a person that was thoughtless from the evidence that I heard, *Page 18 
talking on a telephone. I have structured my sentence to take into account the fact that if this man had the common sense to stop, he may not have been charged with a traffic offense. I suspect, under the circumstances, he would have been charged with reckless driving or something, but there's nothing indicating that he had any willful intention to strike these people in the roadway. But it was his actions afterwards and that is what he was found guilty of, the three charges * * *.
 {¶ 50} "* * *
 {¶ 51} "Hit skip. * * * Tampering with evidence, and he went out and got his girlfriend involved in the thing. She ended up with a charge on her. And you overlay that with his past record, plus after he's under all of these problems with this Jury trial, he's arrested again and given a jail sentence in the Warren Municipal Court for marijuana and some other charge.
 {¶ 52} "[Defense Counsel:] He wasn't arrested until a year after this event.
 {¶ 53} "The Court: My point is, it is a subsequent charge. This whole scenario that came out through the evidence is one of these people that has nothing to do but ride around in his girlfriend's car, looking for the next opportunity, whatever it is. That is what I have structured my sentence on."
 {¶ 54} Defense counsel again voiced his concern that the court would base its sentence upon media coverage and public outcry. The court responded:
 {¶ 55} "* * * You have got just the opposite of what I'm trying to say. This court is not going to be railroaded into doing something that I feel is improper, just because the *Page 19 
whole world is out there thinking that I am wrong on it. That is the reason I want to know what this fellow's past record was.
 {¶ 56} "The picture painted during the entire trial was of a really slick conniver being a Defendant here, who was just an operator and he's going to get things set up the way he wants them. His father testified, and his father, although a rough looking fellow, I suspect is probably a pretty decent man. When your client came to him, I believe he told him something about, `You better get this straightened out. You better turn yourself in.' He didn't take his father's advice. He did just the opposite. Continued to try to cover the thing up.
 {¶ 57} "And I have looked at this whole thing from a standpoint that if I have to do what I have to do, I knew all of these people were going to be out here. I'm not going to be bulldozed by that. I'm just saying, that may be what you say is true, I don't know what brought this thing in. I suspect because it was a child, a ten year old child and a cute little girl and all of this stuff. My point is, if it was somebody else, this would have never been given the publicity that it has gotten.
 {¶ 58} "It is a set of facts, but your client is entitled to a fair evaluation on the part of the Court as to what is an appropriate sentence here. That is the reason I bring that up. It is like the elephant in the room, nobody is going to talk about it, I'm going to mention it. That is all I have to say."
 {¶ 59} After the foregoing discussion, the parties reconvened in open court and the judge, after setting forth its reasoning, rendered his sentence, a ten year aggregate term of imprisonment. *Page 20 
 {¶ 60} Nothing in the record, when placed in the context of the entire discussion had by the court and both parties, suggests the court's sentence was a product of bias or unfairness. The court pointed out that it desired to know appellant's past criminal background to make sure its sentence was fair regardless of the public's tendentious viewpoint. The court acknowledged the media and public attention but also expressly stated it would not be influenced by the same. The record supports this acknowledgement. The court's sentence was based upon multiple considerations, all of which were appropriate; to wit, the court emphasized the fact that appellant struck a 10 year old girl while driving with a suspended license and, rather than stop and assist the victim, he left the site of the accident and attempted to dispose of the vehicle to avoid detection and responsibility. The court further expressed its dismay at appellant's decision to involve his girlfriend, Raheema Wright, in his criminal ruse. In addition to these facts, the court also emphasized appellant's past criminal record, which included a marijuana trafficking conviction, a Federal firearm conviction, and, during the pendency of the underlying matter, convictions for possession of marijuana and falsification. When viewed objectively, these factors soundly support the court's decision to render the sentence it did.
 {¶ 61} Further, appellant could have received a maximum of eleven years, a sentence the state was seeking. Instead of receiving the maximum, the court imposed a ten year sentence. There is no evidence of bias or prejudice in the court's decision. Further, the court's sentence fell squarely within the available statutory range. As a *Page 21 
result, we hold the court's decision to sentence appellant to an aggregate term of ten years was neither contrary to law nor an abuse of discretion.
 {¶ 62} Appellant's third assignment of error lacks merit.
 {¶ 63} Appellant's fourth assignment of error contends:
 {¶ 64} "Appellant's convictions are against the manifest weight of the evidence."
 {¶ 65} A challenge to the manifest weight of the evidence raises a factual issue and involves "the inclination of the greater amount ofcredible evidence." State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52 (emphasis sic) (citation omitted). Although the weight to be given to the evidence and the credibility of the witnesses is primarily for the trier of fact to determine, State v. Thomas (1982), 70 Ohio St.2d 79, at syllabus, when reviewing a manifest weight challenge, an appellate court sits as the "thirteenth juror." Thompkins,78 Ohio St.3d at 387 (citation omitted). Accordingly, a reviewing court must consider all the evidence in the record, the reasonable inferences, the credibility of the witnesses, and whether, "in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed * * *." Id., quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. A reviewing court may exercise its discretionary power to grant a new trial only in "those extraordinary cases where, on the evidence and theories presented, and taken in a light most favorable to the prosecution, no reasonable [trier of fact] could have found the defendant guilty." State v. Bradford (Nov. 7, 1988), 5th Dist. No. CA-7522, 1988 Ohio App. LEXIS 4576, at *4, citing Martin, supra, at 175. *Page 22 
 {¶ 66} Appellant was convicted of "hit and skip," in violation of R.C.4549.02(A) and (B),, tampering with evidence, in violation of R.C.2923.03(A)(1) and (B); and complicity to tampering with evidence, in violation of R.C. 2923.03(A)(1) and (F) and R.C. 2921.12(A)(2) and (B). We shall treat each charge in turn. R.C. 4549.02 provides, in relevant part:
 {¶ 67} "(A) In case of accident to or collision with persons or property upon any of the public roads or highways, due to the driving or operation thereon of any motor vehicle, the person driving or operating the motor vehicle, having knowledge of the accident or collision, immediately shall stop the driver's or operator's motor vehicle at the scene of the accident or collision until the driver or operator has given the driver's or operator's name and address and, if the driver or operator is not the owner, the name and address of the owner of that motor vehicle, together with the registered number of that motor vehicle, to any person injured in the accident or collision or to the operator, occupant, owner, or attendant of any motor vehicle damaged in the accident or collision, or to any police officer at the scene of the accident of collision.
 {¶ 68} "In the event the injured person is unable to comprehend and record the information required to be given by this section, the other driver involved in the accident or collision forthwith shall notify the nearest police authority concerning the location of the accident or collision, and the driver's name, address, and the registered number of the motor vehicle the driver was operating, and then remain at the scene of the accident or collision until a police officer arrives * * *.
 {¶ 69} "* * * *Page 23 
 {¶ 70} "(B) * * * If the violation [of division (A)] results in serious physical harm to a person, failure to stop after an accident is a felony of the fifth degree."
 {¶ 71} The state put forth evidence that appellant was driving the Mazda SUV on August 16, 2004 when, at approximately 9:40 p.m. he struck the victim and continued driving without stopping. Jarrell Reed testified he was a passenger in the vehicle at the time of the accident. Reed stated appellant was driving the vehicle and upon crossing the intersection of North Road and Route 422 "somebody hit the windshield." The duo briefly stopped in an Arby's parking lot when Reed instructed appellant to "take off." They continued down 422 and stopped on an unknown road in the east side of Warren. During the drive, Reed testified appellant called Wright and instructed her to report the Mazda stolen.
 {¶ 72} As emphasized above, Wright testified appellant called her on the night of August 16, 2004 and stated "he may have hit a deer or some people or something." Appellant's father also testified appellant arrived at his home on the night in question and disclosed he was "in trouble" because he thought he "hit somebody."
 {¶ 73} The foregoing testimony set forth credible, consistent evidence that appellant was driving the Mazda SUV on August 16, 2004 when it struck the victim causing her serious physical injuries. There was no testimony indicating anyone other than appellant was the driver of the vehicle when the accident occurred. Although appellant asserts that an individual named Tee Hendix was the actual perpetrator, the evidence suggests that this name was merely an alias or pseudonym used by appellant. To wit, even though the phone was listed under the name Tee Hendix, Wright testified *Page 24 
she regularly paid the bill and appellant was its regular user. Further, as indicated supra, phone records indicated the cell phone at issue was involved in 13 phone calls with Wright's phone after the time of the accident. At trial, Wright confirmed she and appellant spoke multiple times that night, including immediately after the accident.[3] As a result, we hold the jury did not lose its way in convicting appellant of "hit and skip" because the evidence demonstrated appellant fled the scene after striking the victim with the Mazda SUV leaving her with serious physical injuries.
 {¶ 74} Next, appellant was convicted with tampering with evidence in violation of R.C. 2921.12(A)(1), which provides:
 {¶ 75} "(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:
 {¶ 76} "(1) Alter, destroy, conceal, or remove any record document, or thing, with purpose to impair its value or availability as evidence in such proceedings or investigation;"
 {¶ 77} Appellant asserts his conviction on the foregoing charge is against the weight of the evidence because the state failed to prove appellant "hid" the vehicle after the accident. We first point out that the statute does not require an offender to "hide" a *Page 25 
piece of evidence in order to be convicted. The statute is worded in the alternative so that an individual may be convicted if he or she alters, destroys, conceals, or removes evidence with the purpose to impair its evidentiary value or availability. In the instant matter, the evidence reflected appellant, after striking the victim with the SUV,removed the vehicle from the scene and ultimately succeeded in attempting to conceal it by functionally endorsing Wright's decision to store the vehicle in her cousin's garage. Under the circumstances, therefore, we hold the state put forth sufficient, credible evidence to support a conviction on the tampering charge beyond a reasonable doubt.
 {¶ 78} Finally, pursuant to our analysis of appellant's second assignment of error, we hold the jury did not lose its way in convicting appellant of complicity to tampering with evidence. Specifically, the record demonstrates appellant immediately called Wright after the accident and advised her to file a false police report. The evidence also revealed the duo exchanged a total 13 cell phone calls from the time the accident occurred until Wright recovered her vehicle. In short, there was sufficient, compelling evidence that appellant solicited Wright to commit the crime of tampering with evidence; to wit, knowing the hit and skip would be a target of police investigation, appellant advised Wright to file a false police report indicating the SUV had been stolen from her home. Nothing in the record suggests the jury's verdict resulted in a miscarriage of justice.
 {¶ 79} Appellant's fourth assignment of error lacks merit. *Page 26 
 {¶ 80} For the reasons discussed above, appellant's four assignments of error are not well taken. The judgment on conviction entered by the Trumbull County Court of Common Pleas is hereby affirmed.
MARY JANE TRAPP, J., concurs,
COLLEEN MARY OTOOLE, J., dissents with Dissenting Opinion.
[1] As a result of her plea, Wright received a $250 fine, a 90 day suspended jail sentence, with non-reporting probation.
[2] On March 24, 2008, the state filed a document in this court entitled "Notice of Discovery." The Notice reported that, on March 13, 2008, two days after oral argument, Niles City Police discovered the formerly missing micro-cassette tape recording of Raheema Wright's interview with Warren City Police. The minicassette represents newly discovered evidence which came to light subsequent to the certification of the trial record. Because the tape was not part of the trial record, its discovery cannot impact our analysis of appellant's first assignment of error.
[3] In addition to the evidence presented by Wright supporting the conclusion that "Tee Hendix" was merely an alias used by appellant, Tom Cool, court appointed process server, testified he attempted to serve Tee Hendix on numerous occasions but was unsuccessful. In an attempt to locate the individual, Cool testified he checked address on the phone records but could not find the listed house. He stated the house he located "didn't actually have a house number but it was between two houses [and therefore] that could be the only house it could be." Moreover, Cool stated "I made about nine attempts at that house. It was on Oak Street. I also checked Oak Circle. I checked in three different local phone books. I checked Mahoning County phone book. Columbiana County phone book. I checked with Bail Bonding Company data base to see if they had any record of him. I talked to three bail bondsman. I talked to several neighbors, people outside, including his next door neighbor at that house; none of which knew of him."