[Cite as *State v. Hatton*, 2021-Ohio-1416.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
PICKAWAY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | Case No. 19CA34 |
| Plaintiff-Appellee, | : | |
| | : | |
| v. | : | <u>DECISION AND JUDGMENT</u> |
| | : | <u>ENTRY</u> |
| MARTIN L. HATTON, | : | |
| | : | |
| Defendant-Appellant. | : | **RELEASED: 04/19/2021** |

_____
<u>APPEARANCES:</u>

John M. Gonzales, Columbus, Ohio, for Appellant.

Judy C. Wolford, Pickaway County Prosecutor, and Jayme H. Fountain, Assistant Pickaway County Prosecutor, for Appellee.
_____

Wilkin, J.

{¶1} This is an appeal from a Pickaway County Court of Common Pleas judgment that denied appellant, Martin L. Hatton's, motion for leave to file a motion for a new trial and a petition for post-conviction relief. On appeal, appellant asserts three assignments of error: (1) the trial court erred by overruling his motion for leave to file a motion for a new trial pursuant to Crim.R. 33(A)(6), (2) the trial court erred by overruling his petition for post-conviction relief pursuant to R.C. 2953.21 and 2953.23, and (3) the trial court deprived him of his due process rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) when material evidence and actual DNA test results were not disclosed to him. Having reviewed the record, appellant's arguments, and the applicable law, we affirm the trial's court judgment.

BACKGROUND

{¶2} On January 29, 1997, the state charged appellant, along with co-defendant, Rickey Dunn ("Dunn"), with rape, burglary, kidnapping, felonious assault, and theft. The following is a review of the pertinent facts of these offenses as recounted in *State v. Hatton*, 4th Dist. Pickaway No. 05CA38, 2006-Ohio-5121, ¶ 3-17:

> On January 18, 1997, at approximately 1:17 a.m., [the] seventeen year old [victim] awoke to the sound of footsteps in her bedroom. (Footnote omitted) Shortly thereafter, [she] felt a gloved hand covering her mouth and saw a strange man's face inches away from her. The man held a knife to [the victim's] neck and told her that she "better really love [her] parents, that if [she] screamed or made any noise he was going to kill" her family. The man raped [her] in her bedroom and then took her downstairs to the family room. Once downstairs in the family room, a second man raped [her]. While the second man was raping [the victim], the first man left the room. When the first man came back, he told the second man that they had to leave. The second man stated that he was not ready to leave because he was "not done" with [the victim].

> [The victim] and the two men heard footsteps upstairs. [The victim's] father, Paul, hearing footsteps in the house, had woken up to investigate. As he proceeded down the stairs, he heard someone say, "Let's get the hell out of here. Someone's coming." Paul saw the first man fleeing the residence. The second man ran into Paul. The two men struggled. During the struggle, the second man was yelling, "Marty, Marty, Marty!" He told Paul, "My buddy's got a gun, he will come in and kill you all." Paul asked the second man who Marty is, and the man replied, "I don't know why I am here. I came with Marty Hatton."

> As Paul was struggling with the second man, [the victim] ran upstairs to her parents' bedroom to find her mother. [She] told her mother what happened and telephoned 911.

> Circleville Police Sergeant Wayne Gray and Circleville Police Officer David Haynes were the first officers on the scene. As Sergeant Gray entered the front door, he saw Paul standing over the second man, who was laying on the floor and was

yelling, "Where's Marty?" The second man said several times that he had been at the residence with "Marty." Sergeant Gray told the man that he did not know who "Marty" was. The second man stated it was "Marty Hatton." The officers learned that the second man was Ricky Dunn. The officers arrested Dunn and, when additional officers arrived on the scene, began searching for Hatton. The officers did not, however, find Hatton.

Following his arrest and at trial, Dunn explained the events surrounding the burglary and rape as follows. Dunn testified that he was with Hatton on the night of January 17, 1997, and they went to the Match Box Tavern. After leaving the bar, Dunn and Hatton went to Chatham Drive. Hatton told Dunn they were going to Chatham Drive to talk to one of his friends. When they got to Chatham Drive, Hatton told Dunn that he was going to rob a house. Dunn stated that he thought Hatton was kidding. Hatton told Dunn that "he would leave [Dunn] laying on the ground if [Dunn] didn't do it." Hatton and Dunn went to one house, but could not open the door. They then went to the next house and walked around the side entrance to the garage. Hatton opened the door with a credit card. Hatton and Dunn entered the garage and Hatton began looking through the cars. Hatton found a set of keys in one of the cars.

Hatton then entered the house while Dunn remained in the garage. Some time later, Hatton returned to the garage and told Dunn to come inside. When Dunn entered the house, he saw [the victim] standing against the wall. Dunn said Marty was laughing, stating, "Look at this, * * * seventeen years old." Dunn told Hatton, "Oh, no, don't do this. Let's get out of here." Dunn stated Hatton would not listen to him.

Hatton told Dunn that he had sex with [the victim] and that Dunn was also going to have sex with her. Dunn told Hatton, "no way, I am not going to do that." Dunn again told Hatton that they should leave. Hatton grabbed [the victim], held the knife to her neck and said if Dunn did not have sex with her, Hatton would kill her.

Hatton led [the victim] into the family room and told [the victim] to lay down on the couch. He told Dunn to get on top of her. Hatton held the knife to [the victim's] neck and told her not to make any noise. Hatton shone a flashlight on [the victim] and Dunn to make sure that Dunn was having sex with her. Dunn stated that he was not able to have sex with her because he was scared. Approximately five minutes later, Dunn heard someone

coming downstairs. Hatton said, "Let's get the hell out of here, somebody is coming." Dunn replied, "I am not ready yet." Dunn stated he did not want to leave with Hatton because he was afraid Hatton would kill him and [the victim]. Dunn later informed the officers that Hatton had been wearing a dark colored sweatshirt on the night in question.

The next day Circleville Police Officer Kevin Clark and Pickaway County Sheriff's Department Sergeant Mike Wears went to Hatton's house to question him about his whereabouts during the preceding night and about Dunn's allegations. The officers informed him that Dunn had stated that he had been involved in a burglary and a rape at the Chatham Drive residence during the overnight hours. Hatton told the officers that he had no idea what the officers were talking about. Hatton stated that he had not seen Dunn the previous evening. Hatton stated that on the previous evening, he returned home shortly before midnight, watched a movie with his wife, and went to bed.

Hatton informed the officers that he was willing to help out in any way that he could and that he was not involved in the crimes. The officers asked him for the clothes he had been wearing the previous evening, and he gave them a pair of jeans, a sweater, a shirt, and a pair of underwear. Hatton did not turn over the dark colored sweatshirt that Dunn claimed he wore. The officers also asked Hatton to accompany them to the police station for a line-up.

At the police station, Hatton voluntarily participated in a line-up. The victim could not, however, identify the perpetrator. Officer Clark then took Hatton into an interview room. Officer Clark wanted to ask Hatton some questions about Dunn's allegations, but Hatton stated that he wanted to speak with an attorney. Officer Clark stated that the officers had discovered that Hatton was in Laurelville with Dunn on the night in question. Hatton stated that he was in Laurelville. Hatton stated that he wanted to help clear his name and that he did not do anything wrong.

Hatton asked Officer Clark what he could do to clear his name. Officer Clark stated that the police would need blood and pubic hair samples, and that they would need to search his house. He agreed to provide the samples and to let the police search his house.

During the search of Hatton's home, the officers took a dark colored sweatshirt from the closet located in the master bedroom. The sweatshirt had a dried white substance on it which the officers suspected to be semen. Hatton's wife confirmed that Hatton had been wearing the sweatshirt on the night in question.

When Raman Tejwani, a DNA analyst with the Columbus Crime Lab, analyzed the swabs and the underwear, she determined that the semen came from more than one male contributor, but she was not able to exclude or include Hatton as a contributor. Tejwani also stated that her analysis of the semen stained sweatshirt was inconclusive because the sample did not contain enough DNA.

In his defense, Hatton presented the testimony of Larry M. Dehus, a forensic scientist. Dehus testified that he examined Hatton's pubic hair sample and discovered a foreign pubic hair. Dehus stated that he microscopically compared the foreign pubic hair to [the victim's] pubic hair and, unlike the state's expert, concluded that the two were dissimilar. Dehus further stated that the state's expert's report did not account for a black pubic hair that was discovered. Dehus stated that an examination of the black pubic hair could have determined whether the hair was similar to [the victim's], or whether the hair was similar to either Hatton or Dunn. Dehus also stated that from reviewing CCL's DNA analysis reports, it appeared to him that a third individual contributed to the semen samples.

{¶3} The jury convicted appellant of all charges, and the trial court imposed an aggregate 39-year prison term. *State v. Hatton*, 4th Dist. Pickaway No. 97CA34, 1999 WL 253450, * 6. We affirmed appellant's conviction on direct appeal. *Id.*

{¶4} Approximately one year after his conviction, on June 10, 1998, counsel for appellant called criminologist Raman Tejwani ("Tejwani") and discussed some of the DNA evidence in appellant's case. Two days later, on June 12, 1998, appellant filed his first petition for post-conviction relief, which the trial court denied. We affirmed the denial in *State v. Hatton*, 4th Dist. Pickaway

No. 00CA10, 2000 WL 1152236 * 4.  Appellant filed numerous, additional post-conviction pleadings.  *See State v. Hatton*, 4th Dist. Pickaway No. 5CA38, 2006-Ohio-5121 (Affirmed the trial court's denial of appellant's request for DNA testing); *State v. Hatton*, 4th Dist. Pickaway No. 6CA35, 2007-Ohio-3725 (Affirmed the trial court's denial of appellant's second petition for post-conviction relief); *State v. Hatton*, 4th Dist. Pickaway No. 9CA4, 2010-Ohio-1245 (Affirmed the trial court's denial of appellant's motion for DNA testing); *State v. Hatton*, 4th Dist. Pickaway No. 11CA21, 2012-Ohio-2019 (Affirmed the trial court's denial of appellant's motion to vacate his conviction due to the trial court's lack of subject matter jurisdiction); *State v. Hatton*, 4th Dist. Pickaway No. 11CA23, 2013-Ohio-475 (Affirmed the trial court's denial of appellant's motion for leave to file a motion for a new trial); *State v. Hatton*, 4th Dist. Pickaway No. 13CA26, 2014-Ohio-3601 (Affirmed trial court's denial of appellant's motion for a new trial).

{¶5} Most recently in 2019, appellant filed another motion for leave to file a motion for a new trial, as well as a petition for post-conviction relief.  In support of both pleadings, appellant alleged newly discovered evidence, namely a memorandum ("memo") drafted by Tejwani dated June 22, 1998.  Appellant alleges that the memo contradicts Tejwani's trial testimony that the DNA results were inconclusive as to whether appellant was a contributor to the DNA sample recovered from the victim and her clothing.

{¶6} Contrary to appellant's allegations, the trial court held that the memo did not contradict Tejwani's trial testimony, and did not exclude appellant as a source of the DNA recovered from the victim.  The court also found that

appellant's claims were barred by res judicata.  Accordingly, the court denied

both appellant's motion for leave to file a motion for a new trial and his petition for

post-conviction relief.  It is this judgment that is the subject of appellant's appeal.

## ASSIGNMENTS OF ERROR

I.      THE TRIAL COURT ERRED BY OVERRULING APPELLANT'S MOTION
        FOR LEAVE TO FILE A MOTION FOR A NEW TRIAL PURSUANT TO
        CRIM.R. 33(A)(6)

II.     THE TRIAL COURT ERRED BY OVERRULING APPELLANT'S
        PETITION FOR POST-CONVICTION RELIEF PURSUANT TO R.C.
        2953.21 AND 2953.23

III.    THE TRIAL COURT DEPRIVED APPELLANT OF HIS RIGHTS UNDER
        BRADY V. MARYLAND WHEN MATERIAL EVIDENCE AND ACTUAL
        DNA TEST RESULTS WERE NOT DISCLOSED TO THE DEFENSE

## ASSIGNMENT OF ERROR I

{¶7} Appellant argues that the trial court abused its discretion in denying

him leave to file a motion for a new trial under Crim.R. 33(B)(6) based on "new

evidence" that appellant was unable to discover until September 10, 2018 when

he became aware of the memo pursuant to a public records request.  Tejwani

sent the memo to the prosecutor and in pertinent part, the memo appears to

recount her conversation with appellant's post-conviction relief counsel, Yeazel:

> Mr. Yeazel was concerned about the origin of the faint "B" type
> observed at the D7S8 locus in sample 5.  (vagina swabs, male
> fraction) as reported in the Crime Lab log, page 3.  This type was
> not observed in the known blood samples of [the victim],
> [appellant], or [Dunn].  The male samples of the vaginal swabs
> consisted of a mixed DNA sample and no information regarding
> the contributor could be obtained from the DNA typing results
> which were reported as "inconclusive" in the lab report at issue.
> [Id.]  [Red Folder C, doc. 312, Ex. A, June 22, 1998 memo]

{¶8} Appellant argues that the memo conflicts with Tejwani's testimony that the DNA test results were "inconclusive" regarding appellant (i.e., the test results could not include or exclude appellant as having contributed to the DNA) because appellant's blood contains only the A gene at the D7S8 marker, and therefore "conclusively established that [appellant] was not the second rapist." Appellant alleges that "Tejwani understood [appellant was not the second rapist]; and her memo directly contradicted her trial testimony."

{¶9} Finally, appellant argues that any assertion by the state - that appellant's trial was not decided on the DNA evidence, but was supported by other circumstantial evidence - is undermined by the fact that in 2009 Dunn recanted his testimony that implicated appellant in committing the criminal offenses at issue herein. Appellant claims that this recantation also is supported by a newly discovered police report in which the lead detective and state determined that Dunn's incriminating statements were not credible.

{¶10} In response, the state concedes that the trial court's failure to address whether appellant was unavoidably prevented from discovering the evidence in question was error, but claims that it was harmless error. Irrespective of whether appellant was unavoidably prevented from discovering the new evidence, the state asserts that courts have held that a delayed motion for a new trial must be filed within a reasonable time. The state argues that appellant's "evidence" is not new. It asserts that information in Tejwani's memo was available through his attorney "as early as June 10, 1998," and has been

used by appellant in support of other pleadings that he has filed.   Therefore, the state argues that appellant's motion was not timely filed.

**{¶11}** The state also argues that this court, in affirming the trial court's dismissal of appellant's first petition for post-conviction relief in 1998, determined that appellant's expert's affidavit agreed with Tejwani that the DNA results were inconclusive.  Therefore, the memo is not new evidence, and both of appellant's motions are barred by res judicata.

**{¶12}** Prior to addressing appellant's assignments of error, we feel the need to clarify several unsupported assertions made by the appellant in support of his appeal.  Aside from the allegedly perjured testimony of Tejwani regarding the DNA evidence, appellant claims there is no other evidence supporting his convictions.  In particular, he argues Dunn recanted his testimony that implicated appellant in the crimes herein.  In fact, appellant filed a motion for a new trial asserting that Dunn had recanted his testimony implicating appellant.  In support of this motion was an affidavit from Dunn averring that he wrongly identified appellant because he (Dunn) was "cohersed [sic] and threatenend [sic] by Detective Gary Combs to implicate [appellant]."  The trial court found that Dunn's recantation was not credible, and we affirmed the trial court's judgment.  *Hatton*, 4th Dist. Pickaway No. 13CA26, 2014-Ohio-3601.  Dunn's affidavit is undermined by the victim's father, Paul, who testified that he caught Dunn trying to escape the scene, and at that time, prior to the arrival of police, Dunn specifically implicated appellant by his first and last name.  *Hatton*, 4th Dist. Pickaway No. 05CA38, 2006-Ohio-5121, ¶ 4-6.  Further, appellant lied when asked if he had

been with Dunn the night the offenses were committed. *Id.* ¶ 11,13. Finally, testimony established that appellant had worn a dark sweatshirt the night of the rape. *Id.* ¶ 11. And despite seeming to cooperate by turning over clothing to the police, appellant did not turn over the sweatshirt. *Id.* ¶ 12. Only a subsequent search by the police discovered the sweatshirt with what appeared to be a semen stain. *Id.* ¶ 15.

### Law and Analysis

**{¶13}** "[A]n appellate court applies an abuse of discretion standard of review to (1) a trial court's decision whether to conduct an evidentiary hearing on a motion for leave to file a delayed motion for new trial; and (2) its ultimate decision to grant or deny the underlying motion for new trial." *State v. Seal*, 4th Dist. Highland No. 16CA14, 2017-Ohio-116, 75 N.E.3d 1035, ¶ 9, citing *State v. Hoover–Moore,* 10th Dist. Franklin No. 14AP-1049, 2015-Ohio-4863, 50 N.E.3d 1010, ¶ 14*; State v. Jones,* 9th Dist. Summit No. 26568, 2013-Ohio-2986, 2013 WL 3486843, ¶ 8. "An abuse of discretion implies the trial court's decision is arbitrary, unconscionable, or unreasonable." *Id.*, citing *State v. Minton,* 4th Dist. Adams No. 15CA1006, 2016-Ohio-5427, 69 N.E.3d 1108, ¶ 19. "Moreover, a trial court generally abuses its discretion when it fails to engage in a ' "sound reasoning process." ' " *State v. Delawder*, 4th Dist. Scioto No. 18CA3854, 2019-Ohio-3379, ¶ 9, quoting *State v. Morris,* 132 Ohio St.3d 337, 2012–Ohio–2407, 972 N.E.2d 528, ¶ 14, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.,* 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

**{¶14}** "Crim.R. 33(A)(6) permits a trial court to grant a new trial "[w]hen new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial." *State v. Hedges*, 4th Dist. Hocking No. 18CA7, 2018-Ohio-4956, ¶ 11.  "[A] motion for new trial based on newly discovered evidence must be filed within 120 days after the day the verdict was rendered, unless the defendant shows by 'clear and convincing proof that [he] was unavoidably prevented from the discovery of the evidence upon which he must rely * * *.' " *State v. West*, 4th Dist. Scioto No. 17CA3810, 2018-Ohio-1784, ¶ 8, quoting Crim.R. 33(B).

**{¶15}** " '[A] party is unavoidably prevented from filing a motion for a new trial if the party had no knowledge of the existence of the ground supporting the motion for new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence.' " *State v. Bennett,* 4th Dist. Scioto No. 16CA3765, 2017-Ohio-574, ¶ 12, quoting *State v. Walden,* 19 Ohio App.3d 141, 146, 483 N.E.2d 859 (10th Dist. 1984); *State v. Wilson,* 2nd Dist. Montgomery No. 23247, 2009–Ohio–7035, ¶ 8.  And " ' "[t]here is a material difference between being unaware of certain information and being unavoidably prevented from discovering that information, even in the exercise of due diligence." ' " *Id.*, quoting *State v. Lenoir*, 2d Dist. Montgomery No. 26846, 2016–Ohio–4981, ¶ 24, quoting *State v. Warwick,* 2d Dist. Champaign No. 01CA33, 2002–Ohio–3649. "[A] defendant fails to demonstrate that he or she was unavoidably prevented from discovering new evidence when he would have discovered that information earlier had he or she

exercised due diligence and some effort." *Id.* citing *State v. Metcalf,* 2d Dist. Montgomery No. 26101, 2015-Ohio-3507, ¶ 11.

{¶16} Finally, generally speaking, res judicata may be applied to bar further litigation of issues that were raised previously or could have been raised previously in an appeal. *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967). And we have recognized in particular that res judicata bars a motion for a new trial when the movant raised, or could have raised, that issue, in a prior action. *See State v. Lofton*, 4th Dist. Pickaway No. 16CA8, 2017-Ohio-757, ¶ 16, citing *State v. Vincent*, 4th Dist. Ross No. 03CA2713, 2003-Ohio-3998 (finding res judicata barred defendant from raising issues that could have been raised in a prior motion for a new trial or Crim.R. 32.1 motion). " '[R]es judicata promotes the principles of finality and judicial economy by preventing endless relitigation of an issue on which a defendant has already received a full and fair opportunity to be heard.' " *State v. Miller*, 4th Dist. Lawrence No. 11CA14, 2012-Ohio-1922, ¶ 5, quoting *State v. Saxon,* 109 Ohio St.3d 176, 2006–Ohio–1245, 846 N.E.2d 824, ¶ 18.

{¶17} The Supreme Court has recognized a court may decline the application of res judicata when the circumstances render it unjust. *See State v. Murnahan*, 63 Ohio St.3d 60, 66, 584 N.E. 2d 1204 (Superseded by statute in other grounds). *Accord State v. Houston*, 73 Ohio St. 3d 346, 347, 1995-Ohio-317, 652 N.E.2d 1018, 1019. But our standard of review regarding a trial court's decision whether to apply res judicata is abuse of discretion. See *State v. Mackey*, 4th Dist. Scioto No. 14CA3645, 2014-Ohio-5372, ¶ 18.

{¶18} Appellant argues that Tejwani's memo is newly discovered evidence that supports his motion for a new trial, and proves that Tejwani's testimony - that claimed the DNA test results were inconclusive as to whether appellant was a contributor to the DNA sample recovered from the victim - was false, because appellant does not have a "B" gene in his blood.

{¶19} We find that the early procedural history of this case is pertinent to our analysis.  First, we consider the trial.  Prior to trial, the appellant possessed the state's lab report with the DNA test results pertaining to: (1) blood samples from appellant, Dunn, and the victim, and (2) DNA samples swabbed from the victim's panties and vagina, and a sweatshirt.  The lab report displayed DNA test results for "six separate genetic systems," including, pertinent to this case, results at the D7S8 marker.  The lab report indicates that appellant, Dunn, and the victim tested positive for two A genes at the D7S8 marker.  The lab report results for the "male fraction" of two DNA samples from items 4 and 5 at the D7S8 marker were blank, and the report concluded that "[n]o information regarding the contributor can be obtained from items 4 and 5 (Male Fraction) due to the presence of a mixed DNA sample."  Tejwani also created bench notes that pertained to the lab DNA testing/results, which included results for the male fraction samples under the D7S8 marker indicating positive for an A gene and a faint B gene.  The positive result for the "faint" B gene at the D7S8 marker was not included in the lab report.

{¶20} According to appellant,[1] Tejwani testified that the DNA results were inconclusive regarding appellant, which she explained meant the DNA test results did not include or exclude appellant as having contributed DNA to the sample recovered from the victim.  Appellant's counsel on cross-examination asked Tejwani about the results at the D7S8 marker, and appellant asserts that she claimed "[t]hat is another area."

{¶21} Appellant's forensic expert, Larry DeHus ("DeHus"), also testified at trial based on his review of the state's lab results, Tejwani's lab report, and Tejwani's bench notes.  He testified that the DNA used tested "six separate genetic systems," and there was some additional information in Tejwani's bench notes that was not in her report, regarding the D7S8 marker.  He explained to the jury that everyone has two genes at the D7S8 marker, which would be either an A gene or a B gene; so, everyone has either AA, BB, or AB at the D7S8 marker.  He then explained that appellant, Dunn, and the victim tested positive for AA genes in their blood at the D7S8 marker.  He further testified that Tejwani's bench notes indicated that the male fraction from the victim's vaginal swab and her panties tested positive for the B gene. Therefore, DeHus concluded that based upon the lab results provided by the state "these evidence semen samples . . . couldn't have come from [appellant] and couldn't have come from [Dunn] and it couldn't have come from [the victim]."

{¶22} Next, we consider appellant's 1998 petition for post-conviction relief, as well events that occurred just prior to, and after, the filing of that petition.

---

[1] Unfortunately, the record from the trial court is incomplete.  Only Vol.3 of the trial transcript was provided to this court on appeal, and it does not contain Tejwani's testimony.  However, from the numerous decisions from this court addressing appellant's appeals over the years, this assertion appears accurate.

{¶23} On June 10, 1998, appellant's post-conviction relief counsel, Yeazel, called Tejwani, and, according to her communication record, Yeazel "wanted to know about the D7S8 (B) dot in sample 5. "[Tejwani] [t]old him it was a mixed sample and could not determine the source of the type and the results were inconclusive."

{¶24} Two days later on June 12, 1998, appellant filed his first petition for post-conviction relief, which in pertinent part alleged that Tejwani's bench notes showed that a DNA sample taken from the victim's panties indicated the presence of the B gene at D7S8 marker. The petition further alleged that appellant tested positive for the A gene at the D7S8 marker. Therefore, the petition alleged that appellant's conviction was void or voidable because the state, through Tejwani's testimony, "put on evidence it knew was *false* when Ms. Tejwani testified that the analysis she performed on the sample taken from the victim's panties was inconclusive. The presence of the B [gene] at genetic marker D7S8 excluded the victim, [Dunn], and [appellant] as the source." (Emphasis added.) In support of his petition, appellant attached two affidavits, one from Christine Davis, a molecular biologist, and the second was from Keith Lehmkuhl, who was an inmate with Dunn.

{¶25} In addressing appellant's 1998 petition for post-conviction relief, the trial court found that Davis' affidavit provided "no new and material evidence[.]" "Dr. Davis's affidavit clearly states that everything she reviewed and based her opinion upon was submitted and used as evidence during [appellant's] trial. The only thing 'new' being submitted is Dr. Davis's opinion, or

interpretation, of the evidence already presented at trial." The trial court also found that Lehmkuhl's affidavit did not refute other evidence in support of appellant's conviction, including the victim's father who caught Dunn and testified that Dunn implicated appellant by first and last name as being a co-defendant. Thus, the trial court found that appellant's petition was barred by res judicata and dismissed his petition.

{¶26} In appellant's appeal of the trial court's denial of his 1998 petition, we summarized the Davis and Lehmkuhl affidavits respectively:

> Davis opined that the state's DNA analysis of the sperm samples was contaminated and improperly performed. Davis also opined that the state's DNA report failed to account for the presence of a B allele at the D768 [sic] genetic marker. Davis stated that the presence of the B allele indicated either that appellant was not a contributor to the semen or that another individual contributed to the semen sample. Davis noted that sperm could be "transferred in many ways, such as in the laundry hamper where the girl's clothes mingle with her father's or sexually active parents' undergarments. In addition, sperm can be transferred in the wash itself." Davis' affidavit further revealed her agreement with the state's DNA analyst, Raman Tejwani. Davis stated that she agreed with Tejwani's report that stated that the DNA test results were "inconclusive." Davis ultimately concluded: "There are alleles present at both D768 [sic] and GQA1 loci from the sperm fractions of both the vaginal swab(s) and panties samples that are foreign to Dunn, Hatton and Combs, indicating the either the [*sic*] exclusion of Hatton, or the presence of a fourth person."
>
> In his affidavit, Lehmkuhl states that he was a cellmate of appellant's co-defendant, Ricky Dunn. Lehmkuhl indicated that Dunn informed him that appellant "was not the individual who was with him on the night of January 18, 1997, when this crime was committed." Lehmkuhl stated that Dunn advised him that Dunn told the police appellant was involved "because he 'wanted to take the heat off of himself and the police were putting pressure on him to turn over the other guy.' "

*State v. Hatton*, 4th Dist. Pickaway No. 00CA10, 2000 WL 1152236, * 1.

**{¶27}** We "agree[d] with the trial court that *res judicata* bar[ed] the majority of appellant's claims for relief. With respect to appellant's remaining claims, we did not believe that the trial court abused its discretion by determining that appellant failed to present sufficient credible evidence to warrant an evidentiary hearing." *Id.* at * 5. We found that "Davis' affidavit is not altogether different from the testimony of appellant's defense expert, Dehus. Davis, like Dehus, opined that the DNA test results indicated that a person other than the victim, Dunn, or appellant contributed to the sperm sample." *Id.* * 5. We affirmed the trial court's dismissal of appellant's 1998 petition.

**{¶28}** Our review of appellant's trial, Yeazel's conversation with Tejwani just prior to filing appellant's 1998 petition for post-conviction relief, and the allegations in said petition, reveal that Tejwani's memo is not newly discovered evidence that appellant was "unavoidably prevented" from discovering that was necessary to file his motion for a new trial herein. Rather, while appellant did not have access to the memo because it was created after appellant's trial, the pertinent information from the memo was known and available to appellant, during his trial.

**{29}** Therefore, we agree with the trial court that appellant's motion for a new trial is barred by res judicata because he had all the evidence available to raise the issue of the credibility of Tejwani's testimony at trial, and did raise the issue in his 1998 petition for post-conviction relief, albeit unsuccessfully.

**{¶30}** Nevertheless, appellant argues that "[e]ven if [he] has presented this issue before, it would be fundamentally unfair to apply [res judicata] in this

case" because, notwithstanding prior litigation, Tejwani's memo proves her testimony was perjured. Therefore, he argues, applying res judicata would be inequitable.

{¶31} In our prior decision affirming the denial of appellant's 1998 petition for post-conviction relief we noted the following:

> With respect to appellant's argument that Tejwani, the state's DNA analyst, testified falsely, we note that nothing in appellant's petition demonstrates that Tejwani testified falsely. Appellant's argument that Davis' affidavit demonstrates that Tejwani testified falsely is without merit. Davis stated that she agreed with Tejwani's conclusion that the DNA test results were inconclusive.

*Hatton*, 4th Dist. Pickaway No. 00CA10, 2000 WL 1152236, * 1.

{¶32} Simply stated, we find that Tejwani's memo provides no new information that was unavailable in 1998 that persuades us now, but failed to persuade us in 1998, that Tejwani's testimony was perjured. At most her memo is merely cumulative evidence that existed at the time of appellant's trial.

{¶33} Therefore, because res judicata would bar appellant from seeking a new trial, we hold the trial court's decision denying appellant's motion for leave to file a motion for a new trial was not an abuse of discretion. Accordingly, we overrule appellant's first assignment of error.

## ASSIGNMENT OF ERROR II

{¶34} In his second assignment of error, appellant argues that "the newly discovered evidence analyzed in the context of and upon consideration of all available admissible evidence related to [appellant's] case, establishes his actual innocence." Specifically, appellant argues that absent any DNA evidence and

Dunn's recanted testimony there is no other evidence of any type that continues to support his conviction.

{¶35} The state argues that this court in *State v. Hatton*, 4th Dist. Pickaway No. 00CA10, 2000 WL 1152236 (Aug. 4, 2000) held that Tejwani did not give false testimony regarding the DNA results and their relation to appellant's guilt. Therefore, the state argues that the memo is not new evidence, and that res judicata precludes our consideration of appellant's successive petition on this issue.

Law and Analysis

{¶36} "Generally we review decisions granting or denying a post-conviction relief petition filed pursuant to R.C. 2953.21 under an abuse of discretion standard." *State v. Smith*, 4th Dist. Highland No. 19CA16, 2020-Ohio-116, ¶ 16-19, citing *State v. Gondor*, 112 Ohio St.3d 377, 2006–Ohio–6679, 860 N.E.2d 77, ¶ 58. "A petitioner seeking post-conviction relief is not automatically entitled to an evidentiary hearing." *In re B.C.S.*, 4th Dist. Washington No. 07CA60, 2008-Ohio-5771, ¶ 11, citing *State v. Calhoun*, 86 Ohio St.3d 279, 282, 714 N.E.2d 905 (1999), citing *State v. Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169 (1982). "Before granting an evidentiary hearing, the trial court must determine whether substantive grounds for relief exist." *State v. Blanton*, 4th Dist. Adams No. 19CA1096, 2020-Ohio-7018, ¶ 9, citing R.C. 2953.21(D).

{¶37} "Postconviction review is not a constitutional right; instead, it is a narrow remedy that gives the petitioner no more rights than those granted by statute. *Id.* It is a means to resolve constitutional claims that cannot be

addressed on direct appeal because the evidence supporting the claims is not contained in the record." *State v. Smith*, 4th Dist. Highland No. 19CA16, 2020-Ohio-116, ¶ 16-19, citing *State v. Teets,* 4th Dist. Pickaway No. 17CA21, 2018-Ohio-5019, ¶ 14.  R.C. 2953.21 authorizes a person who has been convicted of a criminal offense to file a petition for post-conviction relief, subject to certain limitations and requirements.  Because appellant has previously filed several petitions for post-conviction relief, he is also subject to the requirements of R.C. 2953.23, which provides:

> (A) * * *  a court may not entertain * * *  a second petition or successive petitions for similar relief on behalf of a petitioner unless * * *:
> (1) Both of the following apply:
> (a) * * * the petitioner shows that the petitioner *was unavoidably prevented from discovery of the facts* upon which the petitioner must rely to present the claim for relief, * * * and the petition asserts a claim based on that right.
> (b) The petitioner shows by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted * * *.

{¶38} Similar to our analysis in appellant's first assignment of error, we find that Tejwani's memo does not contain "facts" that were unavailable to him, and upon which he had to rely in filing his petition herein.  Therefore, appellant's petition herein is also barred by res judicata because " '[r]es judicata does not * * * apply only to direct appeals, but to all postconviction proceedings in which an issue was or could have been raised.' "  *State v. Heid*, 4th Dist. Scioto No. 15CA3710, 2016-Ohio-2756, ¶ 18, quoting *State v. Montgomery*, 8th Dist. Cuyahoga No. 99452, 2013-Ohio-4193, 997 N.E.2d 579, ¶ 42, citing *State v. Ketterer,* 126 Ohio St.3d 448, 2010-Ohio-3831, 935 N.E.2d 9, ¶ 59.

**{¶39}** Accordingly, because appellant's petition for post-conviction relief is barred by res judicata, we hold that the trial court did not abuse its discretion in denying appellant's petition without a hearing.  Therefore, we overrule appellant's second assignment of error.

ASSIGNMENT OF ERROR III

**{¶40}** Appellant argues that the state violated his due process through a violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) by not informing him prior to trial that the state's DNA test results proved that he could not have been the rapist ("*Brady* violation").

**{¶41}** The state argues that the *Brady* issue has been previously litigated by this court.  Therefore, the state argues that appellant's motion and petition relying on this argument are barred by res judicata.

Law and Analysis

**{¶42}** This court and other Ohio appellate districts have conducted a de novo review of a trial court's decision regarding whether the state has failed to produce materially exculpatory evidence.  *State v. Fox*, 4th Dist. Ross No. 2012-Ohio-4805, 985 N.E.2d 532, ¶ 26, citing *State v. Whalen,* 9th Dist. Lorain No. 08CA9317, 2008-Ohio-6739, 2008 WL 5329976, ¶ 7; *State v. Russ,* 11th Dist. Trumbull No. 2007-T-0045, 2008-Ohio-1897, 2008 WL 1777828, ¶ 14; *State v. Brown,* 5th Dist. Licking No. 2006–CA–53, 2007-Ohio-2005, 2007 WL 1219539, ¶ 23; *State v. Battease,* 1st Dist. Hamilton Nos. C–050837 & C–050838, 2006-Ohio-6617, 2006 WL 3690689, ¶ 14; *State v. Johnson,* 8th Dist. Cuyahoga No. 82527, 2003-Ohio-4569, 2003 WL 22019780, ¶ 7.

**{¶43}** " 'Due process requires that the prosecution provide defendants with any evidence that is favorable to them whenever that evidence is material either to their guilt or punishment.' " *State v. Campbell*, 4th Dist. Adams No. 13CA969, 2014-Ohio-3860, ¶ 11, quoting *State v. Brown,* 115 Ohio St.3d 55, 2007–Ohio–4837, 873 N.E.2d 858, ¶ 30; citing *Brady,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215. "[A] defendant bears the burden to prove that withheld evidence is materially exculpatory." *Fox*, 4th Dist. Ross No. 2012-Ohio-4805, 985 N.E.2d 532, ¶ 26, citing *State v. Rivas,* 121 Ohio St.3d 469, 2009-Ohio-1354, 905 N.E.2d 618, at ¶ 14; *State v. Lupardus,* 4th Dist. No. 08CA31, 2008-Ohio-5960, 2008 WL 4917518, ¶ 20.

**{¶44}** Appellant asserted a *Brady* violation in the direct appeal of his conviction alleging that "the state failed to disclose the existence of the 'B' DNA gene discovered in the semen sample taken from the victim." *Hatton*, 4th Dist. Pickaway No. 97CA34, 1999 WL 253450, at *20 (Apr. 19, 1999). Appellant claimed that '[t]his finding established beyond doubt that someone other than the victim, Dunn[,] or [a]ppellant contributed to the sample.' " *Id.* We overruled that assignment of error finding

> that Appellant had reviewed the reports. Appellant's expert testified that in his opinion * * * the "B" DNA gene indicated that a third individual contributed to the semen samples collected from the victim. Thus, unlike the typical *Brady* violation when the jury does not have the opportunity to hear about the alleged exculpatory evidence, in the case at bar appellant presented the alleged exculpatory evidence to the jury.

*Id.* at *21.

**{¶45}** In the matter at hand, we find that appellant has not identified any new, material, exclulpatory evidence that the state failed to disclose to him, and because his claim is also barred by res judicata, we overrule appellant's third assignment of error.

CONCLUSION

**{¶46}** Having overruled all three of appellant's assignments of error, we affirm the trial court's judgment entry denying appellant's motion for leave to file a motion for a new trial and dismissing his petition for post-conviction relief.

**JUDGMENT AFFIRMED.**

## JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Pickaway County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Abele, P.:  Concur in Judgment and Opinion.

For the Court,


BY:　　_____
　　　　Kristy S. WIlkin, Judge



**NOTICE TO COUNSEL**
**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**