[Cite as *State v. Blair*, 2014-Ohio-1279.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

STATE OF OHIO

     Plaintiff-Appellee

v.

JAMES C. BLAIR

     Defendant-Appellant


Appellate Case No.    25578

Trial Court Case No.   2011-CR-3790


(Criminal Appeal from
 Common Pleas Court)

. . . . . . . . . . .

**O P I N I O N**

Rendered on the     28th     day of     March    , 2014.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by APRIL F. CAMPBELL, Atty. Reg. No. 0089541, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

SCOTT N. BLAUVELT, Atty. Reg. No. 0068177, 246 High Street, Hamilton, Ohio 45011
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1}     Defendant-Appellant, James Blair, appeals from his conviction and sentence on charges of Assault (Peace Officer) and Carrying Concealed Weapons.   Blair contends that the trial court erred in overruling his motion to dismiss, which was based on the State's destruction of a videotape of the events surrounding Blair's arrest.

{¶ 2}     We conclude that the trial court did err in overruling Blair's motion to dismiss as to count one, the Assault (Peace Officer) charge.   The videotape that was erased by the police was materially exculpatory.   Accordingly, the judgment of the trial court with respect to the Assault (Peace Officer) is reversed and remanded for the trial court to dismiss it. With respect to the Carrying Concealed Weapon charge, the judgment is Affirmed.

## I.   Facts and Course of Proceedings

{¶ 3}     On March 7, 2011, Dayton Police Officer Mark Orick  was on patrol in his cruiser in the area of Edwin C. Moses Boulevard and Washington Street, in Dayton, Ohio.  At about 5:13 p.m., Orick was dispatched to the area of West Third Street and Broadway Street in connection with a black Chevy Impala that was parked at an ATM at that location.   Detective Phillips, who was working on the Safe Streets Task Force, believed that the driver of the car was James Blair, who had an active felony warrant.

{¶ 4}     Orick was only about a minute away, and he proceeded to the intersection.  As Orick traveled westbound on West Third Street, he saw the Impala make a right-hand turn onto West Third Street.   The vehicle then traveled westbound on West Third Street.   After observing the driver fail to signal a lane change, Orick activated his overhead lights and initiated a traffic stop.

{¶ 5}     At the time, Orick's cruiser was equipped with a VHS system.   The VHS

recorder was in the trunk, which was accessible only by police officers who ranked as sergeants or above.   The recorder contained a VHS tape that had to be changed frequently.

{¶ 6}     The camera for the recorder was mounted on the top of the cruiser on the inside, facing out through the front window.   A monitor was attached just below, so that officers could see what the camera was filming.   Activation of the cruiser's overhead lights automatically tripped the camera to begin recording.

{¶ 7}     Orick notified dispatch that the vehicle had been stopped, and he walked up to the driver's side of the Impala.   The vehicle contained three occupants – the driver, a front-seat passenger, and a rear-seat passenger.   Orick identified himself as a police officer, told the driver why he had pulled the vehicle over, and asked for identification from all the occupants.   After determining that the driver was James Blair, which was the name given by Detective Phillips, Orick asked Blair to step out of the vehicle.   Dayton Police Officer Chris Smith arrived on the scene as Orick was in the process of removing Blair from the vehicle.

{¶ 8}     Orick placed Blair to the right of the driver's side door and began to perform a patdown for weapons.   Because Blair had an outstanding warrant for felonious assault, Orick wanted to pat him down to make sure he did not have any weapons.   Orick had a firm grasp on the back of Blair's waistband, and Blair had his hands on the car. According to Orick, when he got to Blair's waist area, Blair spun and attempted to run back to the east or southeast.   Blair pulled Orick a few feet with him until Orick was able to spin Blair back around.   Orick told Blair to stop resisting, and that he was under arrest.   At that point, the two men started to go to the ground. They were near the left front tire of the Impala.

{¶ 9}     As Orick attempted to secure Blair, Blair struck Orick twice on the left and back

side of the head. This occurred, according to Orick, after he and Blair were on the ground struggling. This fact was contradicted by Detective Spears who watched the videotape prior to its erasure wherein Spears noted Orick struck Blair once in the back of the head to get him to the ground.

{¶ 10} While Blair and Orick were struggling, Officer Smith deployed his taser. Orick felt a shock from the wires, and he let go of Blair, who then got up and began to run across the street. Orick subsequently tackled Blair in the eastbound lane, near the curb. At that point, Blair continued to struggle and ignored the officers' commands to place his hands behind his back. Consequently, Smith "dry stunned" Blair, without the taser probes, and the officers were able to secure Blair in handcuffs.

{¶ 11} Officer Smith testified that he got to the scene about 10 seconds after Orick arrived. Smith saw Orick get out and approach Blair's vehicle. Smith stated that while Orick was attempting a patdown of Blair, Blair turned around, swung, and pushed at Orick. According to Smith, this occurred when both Blair and Orick were standing at the driver's side door. Smith also specifically stated that Blair hit Orick twice in the head.

{¶ 12} After explaining to Blair that he was under arrest, Smith used the taser on Blair. Blair broke free and was chased, after which Smith had to perform a stun gun tase on Blair three times before they were able to subdue him.

{¶ 13} Following the arrest, Orick saw a handgun laying in the middle of the street, directly in front of and about ten feet away from the driver's side door of the Impala. At that point, more crews had arrived on scene, and they took both passengers into custody. Thereafter, Orick found a magazine in Blair's right front pocket that belonged to the weapon that was laying in

the street.   As Orick removed the magazine, which had five live rounds, Blair admitted that he had just been trying to run so he could get rid of the gun.

{¶ 14}   Both Orick and Blair were transported to the hospital.   Orick had scuff marks and minor bruising to his right hand from taking Blair to the ground, while Blair received about eight or nine stitches for a wound to his left ear.

{¶ 15}   Because the incident involved use of force, Dayton Police Sergeant Mark Spears conducted an internal investigation.   Spears took statements from Orick and Smith, and from the two passengers, James Wright and Derek Farmer.   The passengers' written statements were not very detailed.   Spears' written report did not specifically mention that Blair had hit Orick.

{¶ 16}   As part of his investigation, Spears removed the VHS tape from the cruiser and took it to the Central Business District on Salem Avenue, which had a television and several recording devices.   The office had an old VHS with a DVD player in the side, which could be used to dub VHS tapes onto a DVD.   The system was at least 15 years old, and   approximately 17 different steps had to be performed to save a VHS tape to DVD format.

{¶ 17}   Spears initially watched the incident and then rewound the tape to the start of the incident.   After doing this, Spears tried to follow the steps to create a DVD.   However, the VHS tape was somehow erased during the process.   The machine did not have an erase button, nor did Spears think he had recorded over the VHS tape.   However, the screen was blank when Spears tried to record, and he concluded that he must have hit the wrong button.   After the tape was erased, it was placed on a 45-day hold in case another part of the tape needed to be used.   The tape was then put back into the unit to be reused.   Significantly, Blair was indicted about one year later.

{¶ 18}   During his review of the tape, Spears was able to see the initial stop and the

contact with Blair. Spears saw the initial struggle outside the car to the point where Blair broke free. Spears acknowledged observing Orick appear to strike Blair once on the back part of his head in order to get Blair down, and he saw Smith approaching. At that point, the machine captured Smith's back. By that time, Blair had already pulled Orick out of the camera's view, so that Spears could not see who was being tased. He could see Smith crouching with the taser and suddenly Blair ran out. Nothing else was captured on the camera.

{¶ 19}   In February 2012, Blair was indicted for Assault (Peace Officer), a fourth degree felony, and for Possession of a Concealed Weapon, also a fourth degree felony. Blair pled not guilty, and then filed a motion to dismiss the charges, based on the destruction of the videotape. After conducting a hearing, the trial court overruled the motion to dismiss. Blair subsequently pled no contest to Assault (Peace Officer), as charged, and to a reduced charge of Carrying Concealed Weapons, a first degree misdemeanor. After accepting the plea, the trial court sentenced Blair to community control sanctions. Blair appeals from his conviction and sentence.

II.   Did the Trial Court Err in Overruling the Motion to Dismiss?

{¶ 20}   Blair's sole assignment of error states that:

"THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO DISMISS."

{¶ 21}   Under this assignment of error, Blair contends that the trial court erred in overruling the motion to dismiss because the evidence on the VHS tape was materially exculpatory. Blair also argues that even if the evidence was only potentially useful, the State acted in bad faith.

{¶ 22}   In overruling the motion to dismiss, the trial court held that Blair had failed to

meet the burden of establishing that the tape was exculpatory in nature. The court noted that while some conflict existed in the witness accounts, three Dayton police officers and two independent witnesses had seen the incident and could testify at trial. Thus, the tape's potential use was simply for purposes of impeaching a witness' recitation of events, and this was not enough to demonstrate that the evidence was exculpatory.

{¶ 23} The principle is well established that "[t]he Due Process Clause of the Fourteenth Amendment to the United States Constitution protects a criminal defendant from being convicted where the state fails to preserve materially exculpatory evidence or destroys in bad faith potentially useful evidence." *State v. Franklin*, 2d Dist. Montgomery No. 19041, 2002-Ohio-2370, ¶ 44, citing *Arizona v. Youngblood*, 488 U.S. 51, 57-58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). (Other citations omitted.) "To be materially exculpatory, 'evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *Franklin* at ¶ 44, quoting *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). "The defendant bears the burden to show that the evidence was materially exculpatory." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 74, citing *State v. Jackson*, 57 Ohio St.3d 29, 33, 565 N.E.2d 549 (1991).

{¶ 24} After reviewing the record, we disagree with the trial court that the evidence was not materially exculpatory. Blair was charged with having violated R.C. 2903.13(A), which provides that "No person shall knowingly cause or attempt to cause physical harm to another or to another's unborn." In situations where the assault is on a police officer, the crime is elevated to a felony of the fourth degree. R.C. 2903.13(C)(5). "Physical harm" is defined by R.C.

2901.01(A)(3) as "any injury, illness, or other physiological impairment, regardless of its gravity or duration."

{¶ 25}  In challenging the trial court's ruling, Blair focuses on inconsistencies in the officers' accounts.  We acknowledge that the testimony of the police officers who witnessed the assault does differ in several key respects, not just in their trial testimony but in the statements they provided to Detective Spears in preparation of the Internal Affairs Report, identified as Defendant's Exhibit  C.  Officer Orick indicated that he hit Blair in the head after the two men were on the ground struggling while Officer Smith's testimony indicates that the men were still standing when Blair hit Orick.  The videotape was the only objective evidence available and the best evidence to support Blair's contention that the violence was initiated by Orick. The videotape would have clarified Blair's defense on this critical point.

{¶ 26}  In contending that the videotape was materially exculpatory, Blair additionally relies on the fact that Sergeant Spears failed to state in his written report, after he reviewed the videotape, that Blair had hit Orick.  This is significant since he noted the blow to the head by Orick upon Blair, but did not note in his report that Blair in fact struck Orick first. When Spears was questioned at the hearing about Orick's account, Spears noted that he had only obtained a brief statement from Orick at the scene.   According to Spears:

> Officer Orick stated that he was wrestling with the Defendant; the Defendant was flailing his arms around, trying to get away.  I don't know.  I'm sure he mentioned that he was struck by him, but that he – it was during the pat down that Defendant attempted to break free and that's when the altercation took place.  And that during that time he [Orick] struck him in the back of the head

trying to take him to the ground.

{¶ 27}    Sergeant Spears made the following further statement in response to whether his report mentioned Blair having swung at or having hit Orick:

No, I think we just probably say that he managed to break free, and by doing that, there's probably some type of force.  When you say that he "broke free," it doesn't sound like the officer said he let him go.  So. You're right.  I was – probably didn't put as much detail, but it said he was – managed to break free.  So I think that kind of insinuates that there's force being used to get away from the officer when he managed to break free.  You don't break free from somebody by standing there and you separate.  When you break free, that means some type of force.  So I probably did not put as much detail as I should have in that report.

{¶ 28}   Given the  inconsistencies in the witness statements, and what Officer Smith and Detective Spears acknowledged having occurred, the tape would have been materially exculpatory.

{¶ 29}   Blair compares his situation to that of the defendant in *State v. Benson*, 152 Ohio App.3d 495, 499, 2003-Ohio-1944, 788 N.E.2d 693 (1st Dist.).   In discussing whether the evidence in that case was materially exculpatory, the First District Court of Appeals observed as follows:

The state argues that, even though the tape was not preserved, it was not materially exculpatory because the field sobriety testing was not recorded on it. Despite the state's arguments, it is possible that the tape was materially exculpatory.  The testimony of Benson and his two eyewitnesses disputed much of the testimony that the officer gave at the suppression hearing and again at trial relating to the stop

and the DUI charge. In our view, the tape would have provided the only possible objective evidence of the events on the night Benson was stopped. Further, the evidence was unique and not obtainable by other means. *Id*. at ¶ 12.

{¶ 30} Like the defendant in *Benson*, Blair would be unable "' to obtain comparable evidence by other reasonably available means.'" *Franklin*, 2d Dist. Montgomery No. 19041, 2002-Ohio-2370, at ¶ 44, quoting *Trombetta*, 467 U.S. at 489, 104 S.Ct. 2528, 81 L.Ed.2d 413. Blair was not obligated to testify, and it is unclear how much of the struggle the passengers were able to observe. One passenger, Farmer, an attorney, wrote in pertinent part "officer began a patdown search. I then saw scuffling and officer and driver went to the ground." His written statement does not indicate that Officer Orick acted properly and that the officer did nothing wrong. The statement of the second passenger, Wright, does not mention a struggle nor an assault, just that the "driver got tased and went to the ground."

{¶ 31} Thus, Blair met his burden to establish that the videotape was materially exculpatory.

{¶ 32} Finally, as previously noted:

* * * we do not condone the destruction of videotapes that record events leading to an arrest:

"Police cruisers are equipped with videotape cameras in order to make a record of those events for any later prosecution. On that basis, and pursuant to Crim.R. 16, they are available for use by an accused as they are for use by the State in such proceedings. The need for care in preserving that record is implied by the force of the

Rule." *State v. Fuller*, 2d Dist. Montgomery No. 18994, 2002 WL 857671, at *4 (April 26, 2002), quoting *State v. Zawacki*, 2d Dist. Montgomery No. 16177, 1997 WL 630026, *2 (July 11, 1997). Officer Spears admitted to having inadvertently destroyed this key evidence, thereby failing in the State's duty to preserve it.

**{¶ 33}** Accordingly, the trial court did err in overruling Blair's motion to dismiss. Blair's sole assignment of error is sustained.

### III.  Conclusion

**{¶ 34}** Blair's sole assignment of error having been sustained, the conviction for Assault (Peace Officer) is Reversed and Remanded for the trial court to dismiss it.  With respect to the Carrying Concealed Weapon charge, the judgment is affirmed.

. . . . . . . . . .

FAIN, J., concurs.

WELBAUM, J., dissenting:

**{¶ 35}** I very respectfully dissent from the majority opinion.  There appears to be no dispute that Blair was physically struggling with Officer Orick in an attempt to get away.  This type of conduct would support a conviction for assault.  Thus, regardless of any inconsistencies in the witness statements, the videotape would have only served to potentially impeach a particular account in some respects; I find no reasonable probability that the videotape's disclosure would have resulted in an acquittal.

**{¶ 36}** We have previously noted that " * * * R.C. 2903.13(A) does not require that a defendant cause physical harm; it also prohibits individuals from attempting to cause physical

harm to another. The testimony from the victim * * * is that [the defendant] was attempting to hit her, and swung at her at least three times. This testimony alone, would have satisfied the requirements for a conviction on the assault charge." *State v. Belcher,* 2d Dist. Montgomery No. 24968, 2013-Ohio-1234, ¶ 57. Similarly, in the case before us, the fact that Blair was swinging at Orick and attempted to hit him would have been sufficient for a conviction on the assault charge.

**{¶ 37}** Orick testified that while he and Blair struggled, and before they went to the ground, Blair threw two elbows to try and break free from his grasp. This alone would have justified an assault charge, without the addition of the blows that Blair allegedly inflicted on Orick's head after they went to the ground. Although Smith believed that Blair struck Orick on the head while they were standing, rather than when the men were on the ground, there is still no dispute that Blair was attempting to cause physical harm to Orick. In this regard, there is no discrepancy in the officers' testimony – at least not in key respects. The video-tape may have clarified the location where the assault occurred, but both officers did testify that Blair hit Orick, which would have been sufficient for a conviction of assault.

**{¶ 38}** The majority opinion also analogizes this case to *Benson,*152 Ohio App.3d 495, 2003-Ohio-1944, 788 N.E.2d 693 (1st Dist.). I disagree. Unlike the defendant in *Benson*, Blair failed to present his own testimony, or the testimony of eyewitnesses, to dispute the testimony of the police officers at the suppression hearing. As the movant, Blair had the burden of establishing that the evidence was materially exculpatory. *Powell*, 132 Ohio St.2d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 74.

**{¶ 39}** Contrary to the assertion in the majority opinion, eyewitness, Derek Farmer, did tell the police that Officer Orick had acted properly. Officer Spears, who conducted the internal

investigation, took brief verbal and written statements from the passengers, one of whom was Farmer. As the majority observes, Spears said that the witnesses' statements were not very detailed – however, Spears also added that the witnesses were evasive.

{¶ 40} Spears additionally said that Farmer did not get into much detail, because he claimed there was some sort of attorney-client privilege. However, Farmer verbally told Spears that the police officer had acted properly and did not do anything wrong.

{¶ 41} As noted, Blair had the burden of establishing that the evidence was materially exculpatory. *Powell* at ¶ 74. Farmer was not counsel for Blair in the criminal case, and Blair could have called Farmer as a witness at the suppression hearing to dispute Spears's statements. However, he failed to do so, and the court was left with Spears's undisputed testimony. Given the decision to overrule the motion to suppress, the trial court apparently found Spears credible.

{¶ 42} When we review cases, we defer to the trial court's determination of credibility. "The 'rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *In re J.Y.*, 2d Dist. Miami No. 07-CA-35, 2008-Ohio-3485, ¶ 33, quoting from *Seasons Coal Co., Inc. v. City of Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

{¶ 43} Furthermore, even in his brief written statement, Farmer admitted that he saw Orick and Farmer scuffle and saw the men go to the ground. And, while the other witness did not mention seeing a struggle, it is not the fault of the police that the witness's statement was evasive and was not very detailed. These independent witnesses (the occupants of the car) were available to dispute the testimony of the officers, and could have testified at trial, meaning that Blair would

be able " ' to obtain comparable evidence by other reasonably available means.' " *Franklin*, 2d Dist. Montgomery No. 19041, 2002-Ohio-2370, at ¶ 44, quoting *Trombetta*, 467 U.S. at 489, 104 S.Ct. 2528, 81 L.Ed.2d 413.

**{¶ 44}** Accordingly, Blair failed to meet his burden to establish that the videotape was materially exculpatory. This leaves the issue, however, of whether the police acted in bad faith. "If the evidence in question is not materially exculpatory, but only potentially useful, the defendant must show bad faith on the part of the state in order to demonstrate a due process violation." *State v. Geeslin*, 116 Ohio St.3d 252, 254, 2007-Ohio-5239, 878 N.E.2d 1, ¶ 10, citing *Youngblood*, 488 U.S. at 57-58, 109 S.Ct. 333, 102 L.Ed.2d 281. "The term 'bad faith' generally implies something more than bad judgment or negligence. 'It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another.' " *Franklin* at ¶ 47-48, quoting *State v. Buhrman*, 2d Dist. Greene No. 96 CA 145, 1997 WL 566154, *12 (Sept. 12, 1997).

**{¶ 45}** In arguing that Officer Spears acted in bad faith, Blair relies on comments that we previously made in *State v. Fuller*, 2d Dist. Montgomery No. 18994, 2002 WL 857671 (April 26, 2002). In *Fuller*, police officers destroyed a videotape after concluding that it did not corroborate their account of what had happened. *Id*. at *4. The officer who stopped the defendant's car stated that he had seen the defendant "make a throwing motion as though he were throwing something out the window." *Id*. at *1. When the officer approached the car, he saw a green stick on the ground and recognized it as a stem from a marijuana plant. *Id*. However, because the tape did not "clearly depict" the tossing motion, the officers decided it was not relevant for a court

proceeding, and destroyed the tape. *Id.*

**{¶ 46}** We concluded in *Fuller* that the officers had not acted in bad faith. In this regard, we observed that:

> There is no evidence that the officers had an intent to mislead in destroying the videotape. To the contrary, they candidly testified that the contents of the videotape did not corroborate their story. Thus, the evidence does not establish that they acted in bad faith. *Fuller* at \*4.

**{¶ 47}** As the majority opinion notes, we did stress in *Fuller* that we do not condone the destruction of videotapes that record events leading to an arrest. *Id.* at \*4. I agree with that statement as a general principle. However, the case before us differs factually from *Fuller*. There is no indication that Blair's videotape was intentionally destroyed because it did not coincide with the accounts of the police officers. Sergeant Spears was not charged with investigating whether Blair had committed assault; he was attempting to copy the tape for use in connection with an internal investigation over the use of force. Rather than acting intentionally, Spears simply made an error in following the instructions for copying tapes. At most, Spears' actions were negligent. *Compare State v. Bolden*, 2d Dist. Montgomery No. 19943, 2004-Ohio-2315, ¶ 56 (finding no bad faith where officer may have accidentally erased chat logs.)

**{¶ 48}** Furthermore, contrary to Blair's claims, there would have been no reason to preserve the videotape beyond the 45-day hold, which appears to have been customary procedure. The videotape was only preserved for that length of time in order to allow access in case the police needed to use another part of the videotape. The portion pertaining to the incident was blank, and preserving a blank videotape indefinitely would have served no purpose. Accordingly, the police

did not act in bad faith.

{¶ 49}    For the reasons stated, I very respectfully dissent.   I would affirm the judgment of

the trial court, which overruled Blair's motion to dismiss.

. . . . . . . . . . . . .

Copies mailed to:

Mathias H. Heck
April F. Campbell
Scott N. Blauvelt
Hon. Dennis J. Adkins

Case Name:      *State of Ohio v. James C. Blair*
Case No:                Montgomery App. No. 25578
Panel:                  Fain, Donovan, Welbaum
Author:                 Mary E. Donovan
Summary: