[Cite as *State v. Walker*, 2022-Ohio-1684.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                            :

             Plaintiff-Appellee,              :               No. 20AP-95
                                                (C.P.C. No. 16CR-5764)

v.                                                       :

Traver D. Walker,                                        :               (REGULAR CALENDAR)

             Defendant-Appellant.            :

D E C I S I O N

Rendered on May 19, 2022

**On brief:** [*G. Gary Tyack*], Prosecuting Attorney, and *Michael P. Walton*, for appellee. **Argued:** *Michael P. Walton*.

**On brief:** *Campbell Law*, *LLC*, and *April F. Campbell*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

MENTEL, J.

{¶ 1} Defendant-appellant, Traver D. Walker, appeals from the decision of the Franklin County Court of Common Pleas overruling his motion to dismiss an indictment charging him with two counts of assault under R.C. 2903.13 and one count of harassment with a bodily substance under R.C. 2921.38, as well as the jury verdict convicting him of one of the assault charges. After his timely appeal, the state filed a motion to revoke Mr. Walker's bond and to dismiss the appeal under the fugitive disentitlement doctrine because he "has been on the run and has not reported to his supervising officer." (June 23, 2020 Memo. in Supp. at 5.) Based on the state's concession at oral argument that Mr. Walker was in custody and there were no outstanding capias orders for his arrest, we

overrule the motion as moot.[1]  With regard to Mr. Walker's appeal, for the reasons that follow, we affirm the trial court's ruling on the motion to dismiss and the judgment of conviction.

{¶ 2}  On October 17, 2016, the state indicted Mr. Walker.  The indictment identified police officers as the alleged victims of each offense.  Mr. Walker's motion to dismiss stated that the officers had responded to a domestic violence call on October 7, 2016, arising from an argument between himself and his mother.  (Jan. 3, 2018 Mot. to Dismiss at 2.)  Mr. Walker claimed that while the officers were arresting him, his girlfriend had "videotaped [his] abuse at the hands of the Columbus Police," who then "unlawfully took the cellular phones" containing the video.  *Id.*  He alleged that "the contents of the phone[s] were erased" while in the custody of a police detective, and that the destruction of the video evidence violated his right to Due Process under the United States Constitution.  *Id.* at 2-4.

{¶ 3}  The trial court held a hearing on Mr. Walker's motion on March 29, 2018.  J.H. testified that she was Mr. Walker's girlfriend and that she lived with him at his mother's home.  (Mar. 29, 2018 Tr. at 11.)  She stated that on the day of the incident, her phone was in working order and was not password protected.  *Id.* at 12-13.  According to J.H., after the "altercation" between Mr. Walker and the police began, "they were all falling on the ground, falling on top of my two-year-old son.  So I grabbed my two-year-old son and moved out of the way."  *Id.* at 14.  J.H. testified that she then began recording the incident with her cellphone.  *Id.* at 15.

{¶ 4}  After the officers called for backup, one officer "pulled" J.H. outside and arrested her.  *Id.* at 15-16.  Officers took her "downtown," confiscated her phone, and held it for several weeks.  *Id.* at 17-18.  J.H. called the investigating detective four or five times before she received "a letter in the mail saying my phone was available to be picked up."  *Id.* at 18.  J.H. testified that when she received her phone back, "[i]t was completely wiped out," and the video she had taken of the incident was gone.  *Id.* at 19.  The phone "didn't have any pictures, any videos, any contacts."  *Id.* at 32.  Instead, J.H. claimed that there were "some

---

[1] Mr. Walker's counsel filed a notice of waiver of oral argument the day before it was held.  (May 18, 2021 Notice.)

weird apps on there that [she] didn't put on there." *Id.* She described them as "[t]echnical apps, nothing that I've ever heard of before." *Id.* at 33. After receiving the phone back, she "gave it to [her] son to play with" because she had already obtained a new one. *Id.* at 34. By the time of the hearing, the phone was broken and no longer in her possession. *Id.* at 35.

{¶ 5} On cross-examination, J.H. clarified that she began recording after getting her son away from Mr. Walker and the officers: "I recorded them making the arrest, them abusing the defendants that they were arresting." *Id.* at 23. When asked why she recorded the incident, J.H. stated: "Because of all the police brutality that had been going on, I wanted to make sure I had evidence if anything happened that wasn't supposed to." *Id.* at 24. J.H. claimed that she was not involved in the incident and "just stood by silently and recorded," but also admitted that she had pled guilty to a charge of disorderly conduct arising from the incident based on allegations that she had attempted to interfere in the arrest. *Id.* at 24-25. J.H. stated that she had never watched the recording but believed that it was "three or four minutes" long and included "pretty much most of the incident" before she was pulled outside and arrested. *Id.* at 26. J.H. was adamant that the phone "did record" the incident but did not know "what was on it for sure" because she never had the chance to watch it. *Id.* at 30.

{¶ 6} Officer Matthew Resatar testified that he arrived at the scene after Officer Beck had handcuffed Mr. Walker. *Id.* at 83. He witnessed J.H. and Mr. Walker's mother "yelling" at Officer Beck to get off of Mr. Walker and recounted that they then yelled at him after he "took control" of Mr. Walker. *Id.* at 84-85. While Officer Resatar kept "yelling at them to stay back," he did not notice anyone recording the events with a cell phone. *Id.* at 85-86. He testified that he turned J.H.'s cell phone in as evidence but could not remember why. *Id.* at 89-91. Officer Resatar could only remember that he "was just told it needed to be submitted." *Id.* at 91.

{¶ 7} Officers Darren Stephens, Derek Beck, and Cory Kahoun were each present at the scene and testified that they did not see J.H or anyone recording the incident with a cell phone. *Id.* at 52, 65, 80.

{¶ 8} Detective Randy VanVorhis testified that he "generated a search warrant" to allow information to be retrieved from J.H.'s phone, and "at some point in the

investigation" he "removed the phone from the property room and turned it over to another detective who does all of our phone forensics." *Id.* at 109. Detective VanVorhis stated that he did not examine J.H.'s phone or turn it on or off in the period between retrieving it and handing it over to James Howe, the forensic detective. *Id.* at 112. After Detective Howe examined the phone, Detective VanVorhis was in charge of retrieving it and returning it to J.H. *Id.* at 114-15.

{¶ 9} Evidence introduced at the hearing showed that Officer Resatar turned the phone into the property room on October 7, 2016. (Def. Ex. 3, Evidence and Property Inventory Form.) On October 25, 2016, the phone was released for "investigation" to Detective VanVorhis. (Def. Ex. 7, Property Evidence Transfer Form.) Detective VanVorhis obtained a search warrant for the phone on November 9, 2016 and gave the phone to the forensic investigator on November 10, 2016. (Mar. 29, 2018 Tr. at 119-21; *see also* Def. Ex. 8, Mobile Device Exam report (stating that phone was submitted for analysis on November 10, 2016 by Det. VanVorhis).)

{¶ 10} Detective James Howe, who performed the digital forensic analysis of J.H.'s phone, testified that it contained no video recording of the incident. *Id.* at 132. His analysis was not able to detect whether a video had been deleted from the phone. *Id.* at 132-33. Detective Howe testified that he did not delete anything from the phone. *Id.* at 140. He also stated that if someone had deleted a video file from the phone between October 7, 2016 and the date he performed his analysis of his contents, the type of analysis he performed would not be able to detect the deletion. *Id.* at 149.

{¶ 11} The trial court overruled Mr. Walker's motion to dismiss the indictment. Its ruling applied the test set forth in *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶ 73, "to determine whether the state's failure to preserve evidence rises to the level of a due process violation." (July 23, 2018 Decision & Entry at 4.) The trial court found that "the recording at issue is potentially useful," but that it was not materially exculpatory or that Mr. Walker had presented the evidence of bad faith necessary to demonstrate a due process violation under *Powell. Id.* at 4-5.

{¶ 12} After this ruling, the case proceeded to trial. Officer Beck testified that he and his partner, Officer Darren Stephens, were dispatched to respond to a domestic violence call by Mr. Walker's mother around 2:30 a.m. on October 7, 2016. (Nov. 13, 2019 Tr. at

263, 268.) When they arrived, there was "a lot of screaming" and Mr. Walker's mother told Officer Beck that "her two kids had been fighting and she want[ed] them both to leave." *Id.* at 268. Mr. Walker's sister "was gathering her things" to leave and "was pretty cooperative." *Id.* After she left, Mr. Walker began gathering his things to leave, but was still "highly agitated, pacing around," arguing with his mother, and "screaming." *Id.*

{¶ 13} According to Officer Beck, Mr. Walker had left the house but he and his mother continued arguing while he stood outside waiting for a ride. *Id.* at 270-71. Mr. Walker's friend Y.A. arrived and he, Mr. Walker and his mother "continued to go back and forth, arguing, name calling, [and using] degrading words." *Id.* at 271. Officer Beck stated that Mr. Walker "[s]tarted directing his anger towards" himself and Officer Stephens, "punched the mailbox," and "stormed inside" his mother's house. *Id.* at 272. She followed him down a hallway and "was yelling at him" while Officer Beck "followed both behind [them] to try to, you know, separate the two." *Id.* at 272. Once they reached a back bedroom, she "threw a punch at Mr. Walker" and then he "threw a punch back at her." *Id.* Officer Beck separated them and "started taking her down the hallway." *Id.* at 275. He "handed" her to Officer Stephens and told him to handcuff her. *Id.*

{¶ 14} At that point, Mr. Walker "began running towards" Officer Beck and attempted to strike his mother. *Id.* at 276. Officer Beck "grabbed Mr. Walker from the back of his shirt and pulled him back" in order to separate them again, with the intention of arresting both of them. *Id.* Officer Beck testified that Mr. Walker "immediately spun around in an aggressive manner, had a balled fist and stated something like, Don't fucking touch me." *Id.* at 276-77. He then "proceeded to throw a punch" at Officer Beck. *Id.* at 277. Officer Beck testified that Mr. Walker "hit [him] on the right side of the head, ear [and] neck area." *Id.* Officer Beck described the following scene:

> At that point I grabbed him, we started wrestling. He went to throw another punch. I threw a punch at him, and then we were actively wrestling in the hallway, fighting. I was able to push him and tackle him into the front room where Officer Stephens and [Y.A.] were actively fighting on the ground. We fell over top of them and pretty much it was a crazy melee after that.
>
> Id.

{¶ 15} During the altercation, Officer Beck was able to activate an "officer in trouble" alert to for backup assistance. *Id.* at 279. The alert went out at 2:55 a.m. *Id.* Officer Beck testified that Officer Kahoun responded and began to "assist in holding Mr. Walker down as he continued to flail around, kick and fight," and that he "observed Mr. Walker spit back up in Officer Kahoun's face." *Id.* at 286. While the fighting was going on, Officer Beck "looked up" and saw a child "standing in the corner all by himself or herself." *Id.* at 288.

{¶ 16} Officer Beck recalled that Mr. Walker "was actively fighting and kicking," but was able to eventually "get him handcuffed." *Id.* at 278. While they were on the ground, Y.A. and J.H., Mr. Walker's girlfriend, were grabbing at Officer Beck and attempting to pull him off of Mr. Walker. *Id.* at 280.

{¶ 17} Officer Darren Stephens testified that Mr. Walker, his mother, and Y.A. were yelling at each other outside her house, and that Mr. Walker punched the mailbox before going back in. *Id.* at 343. Officer Stephens initially stayed outside with Y.A. but then decided to go "inside to assist" Officer Beck. *Id.* at 344. He saw Mr. Walker and his mother "throwing punches at each other" and Officer Beck "trying to break it up." *Id.*

{¶ 18} As Officer Stephens was arresting Mr. Walker's mother, Y.A. punched him in the back of the head. *Id.* at 345. Officer Stephens began to hit him back and they fell to the ground, after which Officer Beck and Mr. Walker fell on top of them in the hallway. *Id.* at 346. As Officer Stephens was attempting to arrest Y.A., he recounted that Mr. Walker's mother and J.H. were "starting to grab ahold of us, screaming at us not to touch them, [and] to leave them alone." *Id.* at 347.

{¶ 19} Officer Kahoun was one of the officers who responded to Officer Beck's distress call. *Id.* at 396. Upon arriving, he could "immediately hear commotion, a struggle, a fight that was going on inside the residence." *Id.* at 398. Officer Kahoun "went in to control Mr. Walker," who "continued to kick" and "strike officers with his feet." *Id.* Officer Kahoun testified that as he attempted to roll Mr. Walker over, "he spit into my right eye." *Id.* After that, when Officer Kahoun "was rolling him over to his stomach, he then spit again, which then hit my shoulder." *Id.* at 399. Other officers then put a "spit hood" on Mr. Walker and placed him in a cruiser. *Id.*

{¶ 20} Officer Resatar also responded to Officer Beck's distress call. *Id.* at 421. When he entered the home, he saw Officer Beck with "one knee on * * * Mr. Walker's legs,

who was in handcuffs on the floor." *Id.* at 422. Officer Resatar saw "two females standing in the kitchen door, and they were screaming and yelling basically at Officer Beck and Officer Stephens." *Id.* He testified that they "were coming towards Officer Beck" and he told them to stay back. *Id.* at 422-23. He began to assist Officer Beck by holding Mr. Walker down as other officers arrived. *Id.* at 424. One of the other officers "came in and escorted" J.H. out the front door. *Id.* at 425.

{¶ 21} Officer Resatar testified that "information was relayed to [him] that [J.H.] had a cell phone she said she recorded the incident on." *Id.* at 427. He "relayed that information about the phone" to the detective in a phone call, and Officer Resatar testified that he was asked "to collect it as evidence, place it in airplane mode and then transport it to the property room * * *." *Id.* at 428. He collected the phone from J.H., filled out the "property control evidence sheet" with her information, and submitted it as evidence. *Id.* at 429-33. Officer Resatar testified that he did not access the phone's contents and he placed it in airplane mode before turning it in to the property room. *Id.* at 435. He had no other contact with the phone after turning it in. *Id.*

{¶ 22} Detective VanVorhis was called by the defense. He testified that he had the phone in his possession "every day" during the "16 or 17" days that he had it checked out of the property room. *Id.* at 499, 551. Detective VanVorhis testified that during that time, the phone was "secured in a locked desk behind locked doors." *Id.* at 499. He acknowledged that the paperwork did not show that the phone was locked away or in airplane mode, and that there was nothing "[o]ther than [him] saying it" as evidence that the phone was secured during that time. *Id.* at 500. The detective also believed that the delay "was due to conflicts with * * * Detective Howe's schedule and getting it passed off to him." *Id.* at 556. Detective VanVorhis also stated that he "did not make [the] decision" to confiscate J.H.'s cell phone, asserting that he "never told [Officer Resatar] to take it." *Id.* at 587. He stated that J.H.'s phone was not placed in a bag and sealed because a "cell phone that I'm not looking to obtain DNA or any type of other evidence [from], other than forensics, does not need to be bagged to save evidence." *Id.* at 578.

{¶ 23} The defense also called Detective James Howe, who testified that Detective VanVorhis contacted him on November 10, 2016 to perform a digital forensic analysis of J.H.'s cell phone. *Id.* at 595. Detective Howe stated that evidence from the property room

"would normally be in a property bag" when given to him. *Id.* at 595. However, he also stated that it was "not uncommon" to receive an unbagged cell phone because investigators might "take the phone out of the bag to write their search warrants or take photographs, whatever they have to do to it before it comes to us." *Id.* at 605.

{¶ 24} According to Detective Howe, if a phone he receives for analysis is already in airplane mode, he "would make a notation [that] * * * it was already in airplane mode." *Id.* at 598. However, the report he prepared for J.H.'s phone stated that he placed the phone in airplane mode. *Id.* Thus, he did not "believe" that it was placed in airplane mode prior to his receipt. *Id.* at 599. J.H.'s phone was not password protected when he received it. *Id.* at 622.

{¶ 25} Detective Howe also stated, as he had at the motion hearing, that the type of analysis he performed on J.H.'s phone could not reveal if a file or video had been deleted before he received it. *Id.* at 602. Detective Howe testified that with J.H.'s particular cell phone model, "it would take a couple of steps in order to get [a file] completely off of the phone," including moving it to the trash and then emptying the trash. *Id.* at 616. He also stated that after completing his analysis, the phone was in working order before returning it to Detective VanVorhis. *Id.* at 620.

{¶ 26} The defense called J.H. to testify about her experience of the events of October 7, 2016. She stated that Mr. Walker's mother "called the cops," who "rushed in the house to, like, grab everybody." *Id.* at 628-29. She stated that "three big men were * * * falling on top of my son. So I went to grab my son and then I was recording and stuff. And then they called for backup and a whole bunch of other more cops came. And at that time when all the cops came for backup, I was taken out of the house." *Id.* at 629. She stated that she recorded the incident while inside the house because the officers "were being too rough, using force that they didn't have to use." *Id.* at 631. J.H. stated that she knew how to "remotely wipe a phone," but that she did not do so to her own phone. *Id.* at 633. She believed that the video she recorded would have helped Mr. Walker's case. *Id.*

{¶ 27} Finally, Mr. Walker testified in his own defense. He stated that on October 7, 2016, he and his sister "got into an argument," and that he and J.H. were packing their things to leave his mother's house when the police arrived. *Id.* at 766-67. He denied threatening the officers. *Id.* at 767. Mr. Walker stated that his mother started "cussing and

trying to swing" at him while he went to get the rest of his clothes from her house, at which time "all chaos broke loose." *Id.* at 767-68. He denied striking Officer Beck. *Id.* at 768. Mr. Walker also denied assaulting Officer Stephens or spitting on Officer Kahoun. *Id.* at 769.

{¶ 28} The jury found Mr. Walker guilty of assault on Officer Beck, but returned verdicts of not guilty on the charges of assault relative to Officer Stephens and harassment with a bodily substance against relative to Officer Kahoun. (Nov. 15, 2019 Verdicts.) The trial court imposed a sentence of three years of community control. (Jan. 28, 2020 Jgmt. Entry.)

{¶ 29} Mr. Walker has appealed and assigns the following assignments of error:

> I. Because the officers destroyed the cell phone recording of the incident that Walker's girlfriend made, dismissal of the charges against him was required under the Due Process Clause.

> II. Because the greater amount of credible evidence supports the conclusion that Walker was not the aggressor in the struggle with Officer Beck, the verdict against him should be reversed.

{¶ 30} As an initial matter, we must clarify the standard of review that applies to a trial court's ruling on a claim of a due process violation based on allegedly destroyed evidence. A number of our decisions have reviewed such rulings without specifying the standard of review applied. *E.g.*, *State v. Daniels*, 10th Dist. No. 14AP-326, 2015-Ohio-2649, ¶ 16-23; *State v. Glunt*, 10th Dist. No. 09AP-962, 2010-Ohio-3024, ¶ 9-12; *State v. Woodson*, 10th Dist. No. 03AP-736, 2004-Ohio-5713, ¶ 24-33; *State v. Beliveau*, 10th Dist. No. 01AP-211, 2001 Ohio App. LEXIS 4792 (Oct. 25, 2001). In these cases, uncontroversial factual findings or an absence of evidence may have rendered it unnecessary to mention the customary appellate deference to the trial court on evidentiary matters. *See Daniels* at ¶ 22 (no evidence of bad faith); *Glunt* at ¶ 11 (defendant provided no evidence that "overwritten" videotape of interview after OVI arrest was materially exculpatory); *Woodson* at ¶ 28 (erased 911 recording not evidence of bad faith where "the Columbus Police recycled the disc containing the recording pursuant to established policy"); *Beliveau* at *17-18 (no evidence that tape recorded interview was materially exculpatory or evidence of bad faith). We have also applied an abuse of discretion standard in a case where the claim of

allegedly destroyed evidence, along with other arguments, supported motions for a mistrial and a new trial. *State v. S.A.A.*, 10th Dist. No. 17AP-685, 2020-Ohio-4650, ¶ 32-43.

{¶ **31**} Usually, as in this case, the defendant raises a due process claim based on allegedly destroyed evidence through a motion to dismiss the criminal indictment. *E.g.*, *State v. Geeslin*, 116 Ohio St.3d 252, 2007-Ohio-5239, ¶ 6. Some Ohio appellate courts review such claims de novo. *State v. Hatton*, 4th Dist. No. 19CA34, 2021-Ohio-1416, ¶ 42; *State v. Brown*, 1st Dist. No. C-180236, 2019-Ohio-1615, ¶ 9; *State v. Newton*, 8th Dist. No. 105771, 2018-Ohio-1392 ¶ 15; *State v. Whalen*, 9th Dist. No. 08CA009317, 2008-Ohio-6739, ¶ 7; *State v. Brown*, 5th Dist. No. 2006-CA-53, 2007-Ohio-2005, ¶ 23; *State v. Russ*, 11th Dist. No. 2007-T-0045, 2008-Ohio-1897, ¶ 14. Confusingly, some courts have applied different standards within the same appellate district. *Compare Russ* at ¶ 14 (applying de novo standard) *with State v. Frasure*, 11th Dist. No. 2007-A-0033, 2008-Ohio-1504, ¶ 35 (applying mixed standard of de novo with deference to trial court's factual findings) and *State v. Fox*, 4th Dist. No. 11CA3302, 2012-Ohio-4805, ¶ 22-23 (applying a "hybrid standard of review" combining deference "to the trial court's factual findings as long as competent and credible evidence supports those findings" with de novo review of the application of "those facts to the law") with *Hatton* at ¶ 42 (applying de novo standard with no acknowledgement of previous holding in *Fox*). These courts may only intend for the de novo standard to apply to legal conclusions. However, without further clarification, this risks unintentionally setting precedent that even evidentiary findings should enjoy the standard.

{¶ **32**} This concern motivated the Fourth District's analysis of the issue in *Fox*. There, the court acknowledged the prior application of the de novo standard by it and other appellate courts but determined that "the hybrid standard of review that appellate courts apply to suppression motions and motions to dismiss on the basis of a violation of a defendant's speedy trial right is the more appropriate standard of review to apply when reviewing a trial court's decision regarding a motion to dismiss on the basis that the state failed to disclose materially exculpatory evidence." *Fox* at ¶ 22. The Fourth District reasoned that the Supreme Court of Ohio had tacitly applied such a standard in *Geeslin*, as had the Eleventh District in *Frasure* and its own prior decision in *State v. Lupardus*, 4th Dist. No. 08CA31, 2008-Ohio-5960. *Fox*, citing *Geeslin* at ¶ 14, *Frasure* at ¶ 35, and

*Lupardus* at ¶ 8 and 16 (expressly stating a de novo standard applies to a Brady claim based on police erasing a videotape, but also finding that "[c]ompetent, credible evidence supports the trial court's finding").

{¶ 33} *Geeslin* is particularly instructive. Although, as *Fox* observed, the Supreme Court did not expressly state the standard of review, its legal conclusion that the "missing evidence" was not "materially exculpatory" was obviously de novo, as the appellate court had held otherwise. *Geeslin* at ¶ 13. At the same time, *Geeslin* deferred to "[t]he trial court, which was in the best position to weigh the evidence and the credibility of the witnesses," when upholding its ruling that the defendant failed to show bad faith by the officer who had accidently erased a videotape. *Id.* at ¶ 14. *Geeslin*'s analysis respects the traditional roles of the trial court as the expert in fact-finding and the appellate court as interpreter of the law. These roles should be acknowledged when reviewing the type of due process claim Mr. Walker presents because such claims often come to the appellate court after significant fact-finding efforts in the trial court to resolve disputed, contradictory and unclear facts.[2] Accordingly, we hold that when reviewing a trial court's ruling on a motion to dismiss arising from an alleged due process violation based on destroyed or missing evidence, we defer to the factual findings of the trial court while applying a de novo review of the trial court's application of the facts to the law. *See id.* at ¶ 14-15. *Accord Fox* at ¶ 23 (adopted mixed standard of review). We turn now to the merits of Mr. Walker's argument.

{¶ 34} The Supreme Court has recognized that, under *Brady v. Maryland*, 373 U.S. 83 (1963), "the suppression of materially exculpatory evidence violates a defendant's due process rights, regardless of whether the state acted in good or bad faith." *Geeslin* at ¶ 7, citing *State v. Johnston*, 39 Ohio St.3d 48, 60 (1988). A different standard applies when "evaluating an alleged due process violation based on lost or destroyed evidence." *Geeslin* at ¶ 8. If the evidence is materially exculpable, the *Brady* standard applies and the intention of the state is "irrelevant." *Id.* at ¶ 9, quoting *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988). But the standard for materially exculpable evidence is *State v. Jackson*, 57 Ohio St.3d 29, 33 (1991). "To meet this standard of constitutional materiality, * * * evidence must both

---

[2] As an example, the state "disputes" both "that the video did exist at one point in time and that the trial court found that it did exist," but we defer to the trial court on the issue. (Appellee Brief at 15.)

possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984), citing *United States v. Agurs*, 427 U.S. 97, 109-10 (1976). "If the evidence in question is not materially exculpatory, but only potentially useful, the defendant must show bad faith on the part of the state in order to demonstrate a due process violation." *Geeslin* at ¶ 10. "Unless a defendant can show that the state acted in bad faith, the state's failure to preserve potentially useful evidence does not violate a defendant's due process rights." *Id.* at syllabus, following *Youngblood.*

{¶ 35} Again, *Geeslin* is particularly instructive. In that case, a state trooper pulled the defendant over after observing erratic driving, "smelled alcohol" and noticed the defendant's "bloodshot and glassy" eyes, then arrested the defendant for driving while intoxicated after he failed sobriety and breath tests. *Geeslin* at ¶ 2. During his next shift, the state trooper inadvertently recorded over the portion of the videotape that documented the defendant's erratic driving. *Id.* at ¶ 4. The defendant filed a motion to dismiss the charge, arguing that "the portion of the videotape recorded over contained possible exculpatory evidence," an assertion with which the trial and appellate courts agreed. *Id.* at ¶ 5, 11. The Supreme Court disagreed. Although the defendant could have used the missing video for impeachment purposes or the state could have used it to bolster its witness's credibility, "the missing portion of the tape would have been used only to challenge or corroborate the justification for the stop." *Id.* at ¶ 12. Because the erased video "would not have been used for the purpose of establishing appellant's guilt or innocence," it was not materially exculpatory. *Id.*

{¶ 36} Here, as well, J.H.'s video could not have been used to establish Mr. Walker's guilt or innocence of the charge he faced, and consequently cannot be considered materially exculpatory. The charge in question (and the sole count of which Mr. Walker was convicted) was assault under R.C. 2903.13(A), which provides that "[n]o person shall knowingly cause or attempt to cause physical harm to another or to another's unborn." Because the alleged victim was a police officer, R.C. 2903.13(C)(5) enhanced the charge to a felony of the fourth degree. R.C. 2901.01(A)(3) defines physical harm as "any injury, * * * regardless of its gravity or duration." The substance of the assault charge was the "punch"

that Officer Beck described Mr. Walker throwing at him, landing "on the right side of the head, ear [and] neck area." (Nov. 13, 2019 Tr. at 277.) After that, the officer "grabbed" Mr. Walker, and they began "wrestling." *Id.* By J.H.'s own account, she did not begin recording the video until after the altercation between Mr. Walker and Officer Beck had begun and she had been able to remove her child from the melee. (Mar. 29, 2018 Tr. at 14-15, 23-24.) The trial court correctly noted that J.H.'s "delay in initiating the recording necessarily means that the entirety of the incident was not recorded, most importantly what started the altercation." (July 23, 2018 Decision & Entry at 5.) As in *Geeslin*, the missing video could possibly have been used to impeach other portions of Officer Beck's testimony, but it could not have shown that Mr. Walker did not commit the assault itself. Thus, it was not materially exculpatory.

{¶ 37} Mr. Walker argues otherwise, citing several Ohio appellate opinions that involved police destruction of video recordings. (Appellant's Brief at 9.) However, in *State v. Benson*, 152 Ohio App.3d 495, 2003-Ohio-1944, ¶ 11 (1st Dist.), the court did not hold that the destroyed evidence was materially exculpatory. Police destroyed the videotape after the defendant requested it during discovery. *Id.* at ¶ 3. As a consequence, "the burden shifted to the state to demonstrate that the tape was not materially exculpatory." *Id.* at ¶ 11, citing *State v. Benton*, 136 Ohio App.3d 801, 805 (6th Dist.2000), citing *Columbus v. Forest*, 36 Ohio App.3d 169 (10th Dist.1987). The court could only conclude that "it [was] possible that the tape was materially exculpatory," but reversed because evidence of bad faith was clear. *Id.* at ¶ 12 ("It is clear that the officer was dishonest with the prosecution about whether a tape actually existed, and even at the suppression hearing, it was difficult to pin down his answer about whether a tape actually existed."). *Id.* at ¶ 14.

{¶ 38} Neither does *State v. Blair*, 2d Dist. No. 25578, 2014-Ohio-1279, ¶ 25, support Mr. Walker's argument that J.H.'s video was materially exculpatory. The case also involved an altercation between the defendant and police officers, replete with conflicting testimony about the instigator. *Id.* However, unlike J.H.'s video, the *Blair* recording included the entire incident. "The videotape was the only objective evidence available and the best evidence to support [the defendant's] contention that the violence was initiated by [the officer]." *Id.* In contrast to Mr. Walker's situation, the exculpatory value of the videotape in *Blair* was apparent.

{¶ 39} Because the missing video was not materially exculpatory, Mr. Walker can only demonstrate a due process violation if the unavailability of this potentially useful evidence resulted from bad faith. *Geeslin* at ¶ 10. " 'The term "bad faith" generally implies something more than bad judgment or negligence.' " *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶ 81, quoting *State v. Tate*, 5th Dist. No. 07 CA 55, 2008-Ohio-3759, ¶ 13. Bad faith " ' "imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another." ' " *Id.*, quoting *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 276 (1983), quoting *Slater v. Motorists Mut. Ins. Co.*, 174 Ohio St. 148 (1962), paragraph two of the syllabus, *overruled on other grounds*, *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552 (1994), paragraph one of the syllabus.

{¶ 40} Mr. Walker cites to the trial testimony of several of the officers to support his argument that the police acted in bad faith. (Appellant's Brief at 11-12.) However, our review of the evidence to support the contention of bad faith grounds is confined to the record developed at the hearing on the motion to dismiss. *See Columbus v. Beasley*, 10th Dist. No. 17AP-629, 2019-Ohio-719, ¶ 50 ("because our review of the denial of a motion to suppress on appeal is limited to evidence presented at the suppression hearing, we must disregard the evidence presented at trial"); *State v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, ¶ 45 (10th Dist.) ("an appellate court may only consider evidence that was presented during the suppression hearing, and may not consider evidence presented at trial"). Mr. Walker had the burden of producing convincing evidence of bad faith at the pretrial hearing and the trial court ruled on his motion based only on that evidence. *See Geeslin* at ¶ 1 (holding that the defendant must "show that the state acted in bad faith"). Thus, we will not consider evidence of bad faith produced at trial that the trial court did not have the opportunity to review before ruling on the motion. Nevertheless, testimony at the two proceedings was sometimes duplicative and Mr. Walker's brief cites also to his post-hearing memorandum that references the record developed at the motion hearing. Thus, although his briefing lacks the customary and "appropriate references to the record," there is an adequate basis for appellate review of the evidence of the bad faith he alleges. App.R. 16(A)(6).

{¶ 41} Mr. Walker first argues that officers "had no real cause to take the phone of a witness who claimed to have recorded their brutality against a citizen." (Appellant's Brief at 11-12.) Mr. Walker cannot plausibly insist that the phone was both relevant to his defense, materially or otherwise, and that it had no relevance to the investigation of the incident. The video had investigatory value. J.H. herself testified that she recorded it because she "wanted to make sure [she] had evidence if anything happened that wasn't supposed to." (Mar. 29, 2018 Tr. at 24.) Rather than demonstrate bad faith, confiscating the phone simply showed that the officers were performing their job by collecting relevant evidence.

{¶ 42} Mr. Walker also points to the fact that Officer Resatar "had the phone in his possession for four hours" after confiscating it from J.H. as evidence of bad faith. (Appellant's Brief at 12.) During the hearing, the officer was pressed as to why paperwork showed that he did not turn the phone into the property room until 7:46 a.m. when the incident had occurred at approximately 3:00 a.m. (Mar. 29, 2018 Tr. at 99.) This inconsequential delay demonstrates nothing, particularly in light of Officer Resatar's agreement when asked if "it often take[s] a few hours for a scene like that to be cleared, for people to be arrested, interviewed, property collected, turned in, is that typical?" *Id.* at 101.

{¶ 43} There is more substance to Mr. Walker's criticism of Detective VanVorhis having J.H.'s "phone in his own possession for 17 days" before turning it over to Detective Howe for forensic analysis. (Appellant's Brief at 12.) Police paperwork shows that Officer Resatar submitted the phone to the property inventory room on October 7, 2016. (State Ex. A-1.) On October 25, 2016, the phone was released for "investigation" to Detective VanVorhis. (State Ex. A-2.) He did not obtain a search warrant for its contents until November 9, 2016, and he submitted it to Detective Howe for forensic analysis the next day. (Mar. 29, 2018 Tr. at 119; State Ex. B-1, Search Warrant, & State Ex. B-2, Mobile Device Exam Report.)

{¶ 44} Detective VanVorhis was pressed on cross-examination at the motion hearing about the length of time the phone had been in his possession after signing it out from the property room and submitting it for forensic analysis. (Mar. 29, 2018 Tr. at 119.) When shown the property evidence transfer form dated October 25, 2016, he said: "I see the date," but insisted that he "would not have kept that phone for any length of time." *Id.*

When asked to acknowledge that the dates on the paperwork showed that "the phone was signed out on October the 25th and then for 16 days it is in someone's possession before it makes it to the person who does the analysis," the transcript shows that the detective had "[n]o audible response." *Id.* at 120. Detective VanVorhis also insisted that he "would not have had the phone without the warrant." *Id.* He was then confronted with the fact that he did not obtain the search warrant until November 9, 2016. *Id.* at 121. Only then did the detective acknowledge that "the phone was in either [his] possession or someone's possession outside of the property room for those 16 days." *Id.* at 122. His explanation: the form could have "the wrong date" on it, or that "[i]t could have been the person that was going to be receiving it wasn't available at that time," in which case he would have "held on to the phone" and "kept it in a secure location." *Id.* at 124.

{¶ 45} The trial court neither mentioned nor analyzed this exchange before reaching its conclusion that there was "simply no evidence of the State's bad faith." (July 23, 2018 Decision & Entry at 5.) Instead, the trial court professed bewilderment in the face of a seemingly insurmountable logical puzzle: "a finding of bad faith could only be reached by improperly drawing an inference upon an inference (i.e., that the phone was not password protected allowing the police to review its contents in violation of their procedures, infer that police did so and then infer that after such review someone erased the recording)." *Id.* But there was no need to stack inferences. The trial court found that the recording existed. *Id.* at 4. And it was undisputed the phone was not password protected. (Mar. 29, 2018 Tr. at 13 (testimony of J.H.) & 146 (testimony of Detective Howe).) The video was not on the phone by the time Detective Howe analyzed the phone. A willingness to view Detective VanVorhis's testimony more critically might have yielded a single, logical inference about the fate of the video. This would have been justified by the detective's shifting explanations and inability to explain why he personally possessed evidence for over two weeks before obtaining a search warrant.[3] Detective VanVorhis's initial insistence that he "would not have kept that phone for any length of time" before being confronted with the fact that he, in fact, did have the phone as long as he did, underscores the highly irregular length of time

---

[3] Counsel for the state was also pressed at oral argument as to the propriety of a detective who oversees officers being investigated for misconduct having possession of a video possibly documenting that misconduct. Such an investigation is not part of the record in this case.

the phone was in his possession. (Mar. 29, 2018 Tr. at 119.) But silence in the face of these problematic facts is where the trial court leaves us.

{¶ 46} Unfortunately for Mr. Walker, the detective's opacity is insufficient evidence of bad faith. Questions remain, but questions are not evidence of "dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." *Powell* at ¶ 81. Nor can we, as the appellate court, discern "actual intent to mislead or deceive another" in this record, particularly without an accompanying credibility determination by the trial court. *Id.* Accordingly, we affirm the trial court's decision to overrule Mr. Walker's motion to dismiss. The first assignment of error is overruled.

{¶ 47} Mr. Walker's second assignment of error contends that the manifest weight of the evidence did not support his conviction. "To evaluate a claim that a jury verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks,* 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 168, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Reversal on manifest weight grounds is appropriate " 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 48} Mr. Walker argues that Officer Beck's testimony was not credible on the issue of who was "the aggressor" during their altercation. (Appellant's Brief at 13.) "It was just who struck who first that was at issue. Frankly, it is much more plausible the way Walker described it," he insists. *Id.* at 14.

{¶ 49} Mr. Walker is incorrect that the issue is who landed the first blow. That would only be the case if Mr. Walker had sought to prove the affirmative defense of self-defense, which is "an admission of the prohibited conduct coupled with a claim that the surrounding facts or circumstances exempt the accused from liability therefore; 'justification for admitted conduct.' " *State v. Grubb*, 111 Ohio App.3d 277, 282 (2d Dist.1996), quoting *State v. Poole*, 33 Ohio St.2d 18, 20 (1973). Here, there was no jury instruction on self-defense, and Mr. Walker has not raised that omission as error. Furthermore, his testimony is devoid

of any indication "that he had a bona fide belief, even if mistaken, that he was in imminent danger of bodily harm" to justify the use of force, or that "he was not at fault in creating the situation giving rise to the altercation," both of which would have been necessary to prove self-defense. *State v. Keith*, 10th Dist. No. 08AP-28, 2008-Ohio-6122, ¶ 22, citing *State v. D.H.*, 169 Ohio App.3d 798, 2006-Ohio-6953, ¶ 30 (10th Dist.).

{¶ 50} Mr. Walker's plea to accept his version of events as more "plausible" is also not well-taken. The manifest weight standard demands that the appellate court "bear in mind the trier of fact's superior, first-hand perspective in judging the demeanor and credibility of witnesses." *State v. Mickens*, 10th Dist. No. 08AP-626, 2009-Ohio-1973, ¶ 30, citing *State v. DeHass*, 10 Ohio St.2d 230, 230 (1967), paragraph one of the syllabus. "Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25, citing *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7. The jury believed Officer Beck's version of events and believed that Mr. Walker inflicted the harm described. That was all the jury required to convict him of assault because "[t]he testimony of a single witness, if believed by the finder of fact, is sufficient to support a criminal conviction." *State v. Booker*, 10th Dist. No. 15AP-42, 2015-Ohio-5118, ¶ 18, citing *State v. Elqatto*, 10th Dist. No. 11AP-914, 2012-Ohio-4303, ¶ 20, and *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42. Furthermore, the jury's acquittal of Mr. Walker of two of the three charges he faced indicates that the jury took its role seriously and critically scrutinized the evidence before it. We cannot conclude that the same jury "lost its way" on the assault conviction. *Wilks* at ¶ 168. Because the manifest weight of the evidence supported the conviction, we overrule the second assignment of error.

{¶ 51} Having overruled Mr. Walker's two assignments of error, we affirm the judgment of the trial court.

*Judgment affirmed.*

DORRIAN, J., concurs.
NELSON, J., concurring in judgment only.

NELSON, J., retired, of the Tenth Appellate District, assigned
to active duty under the authority of the Ohio Constitution,
Article IV, Section 6(C).

Nelson, J., concurring in judgment only.

{¶ 52} I concur in the judgment of the court and in its account of the shifting explanations offered for the handling of the citizen's cell phone. The facts of this case may. if nothing else, counsel further policy examination of practices and procedures. Ultimately, however, I also concur that under the standards governing our review, the trial court that heard the witnesses firsthand was within its authority to reach the factual determination that it did with regard to the claim of bad faith. Because I also agree that the jury's conviction of Mr. Walker was not against the manifest weight of the evidence, I concur in the judgment of this court.

_____